106 T.C. No. 15

UNITED STATES TAX COURT

TRANS CITY LIFE INSURANCE COMPANY,
AN ARIZONA CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 23678-93, 16934-94.      Filed April 30, 1996.

P is an insurance company authorized to sell disability and life insurance within the State of Arizona. P's primary and predominant business activity is writing credit life and disability insurance policies. During the subject years, P and G, an unrelated entity, entered into two retrocession (reinsurance) agreements for valid and substantial business reasons. Under the terms of each agreement, G retroceded its position on reinsurance to P, and P agreed to pay G a $1 million ceding commission. The agreements helped P qualify as a life insurance company under sec. 816, I.R.C., which, in turn, allowed P to claim the small life insurance company deduction under sec. 806, I.R.C. Relying on sec. 845(b), I.R.C., R disregarded both of these agreements because, she alleged, the agreements did not transfer to P risks proportionate to the benefits that P derived from the small life insurance company deductions under sec. 806, I.R.C.

Held: R may rely on sec. 845(b), I.R.C., prior to the issuance of regulations. Held, further: R committed an abuse of discretion in determining that the agreements had "a significant tax avoidance effect"

under sec. 845(b), I.R.C., with respect to P.  <u>Held</u>, <u>further</u>:  P may amortize each ceding commission over the life of the underlying agreement.

<u>James E. Brophy III</u> and <u>Mark V. Scheehle</u>, for petitioner.[1]

<u>Avery Cousins III</u>, <u>Susan E. Seabrook</u>, <u>Lana Eckhardt</u>, and <u>Nancy S. Vozar</u>, for respondent.

CONTENTS

<u>Findings of Fact</u>

1.  General Facts.................................. 6
    a.  Petitioner................................ 6
    b.  Notices of Deficiency..................... 7

2.  Reinsurance in General......................... 8
    a.  Overview.................................. 8
    b.  Experience Refund Provisions................11
    c.  Risk Transfer and Risk Charges.............12
    d.  Termination................................14

3.  The 1988 and 1989 Retrocession Agreements........15
    a.  Overview...................................15
    b.  Purpose of the Agreements..................19

4.  1988 Agreement...................................21
    a.  Original Agreement.........................21
    b.  First Amendment/Trust Account..............22
    c.  Underlying Business........................24
    d.  Ceding Commission and Risk Charge...........25
    e.  Right To Withhold..........................26
    f.  Recapture..................................27
    g.  Termination................................28

5.  1989 Agreement...................................28
    a.  In General.................................28
    b.  Amendments.................................29
    c.  Underlying Business........................31
    d.  Ceding Commission and Risk Charge...........31
    e.  Right To Withhold..........................34

[1] Brief amicus curiae was filed by <u>John W. Holt</u> and <u>Susan J. Hotine</u> as counsel for the American Council of Life Insurance.

    f.    Recapture....................................35
    g.    Termination..................................35

Opinion

1.    Overview........................................37
2.    Lack of Regulations under Sec. 845(b).............39
3.    Significant Tax Avoidance Effect..................41
4.    Amortization of Ceding Commissions................56

LARO, Judge: Trans City Life Insurance Company, an Arizona corporation, petitioned the Court to redetermine respondent's determinations for its 1989 through 1992 taxable years. Respondent determined deficiencies of $603,356, $510,716, $382,508, and $297,928 in petitioner's 1989, 1990, 1991, and 1992 Federal income taxes, respectively. Respondent's determination for 1989 was reflected in a notice of deficiency issued to petitioner on September 15, 1993 (the 1993 Notice). Respondent's determinations for 1990, 1991, and 1992 were reflected in a second notice of deficiency issued to petitioner on September 12, 1994 (the 1994 Notice).

In her amendments to answers (Amendments), respondent asserted that petitioner was not entitled to amortize ceding commissions payable under two reinsurance agreements with The Guardian Life Insurance Company of America (Guardian). Respondent asserted in her Amendments that the 1989 through 1992 deficiencies were $672,210, $553,533, $437,584, and $354,246, respectively.

We must decide:

1. Whether respondent may rely upon section 845(b), prior to the issuance of regulations. We hold she may.

2.  Whether the two reinsurance agreements at issue had "significant tax avoidance [effects]" under section 845(b), with respect to petitioner.  We hold they did not.[2]

3.  Whether petitioner may amortize the ceding commissions payable under the reinsurance agreements over the life of the agreements.  We hold it may.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the taxable years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.  Dollar amounts are rounded to the nearest dollar. The 50-percent ratio described in section 816(a) is referred to as the Life Ratio.[3]

---

[2] This holding moots another issue before us; namely, whether petitioner's disability insurance policies are "noncancellable" under sec. 816(a)(2).

[3] Sec. 816 provides in part:

SEC. 816. LIFE INSURANCE COMPANY DEFINED.

(a) Life Insurance Company Defined.--For purposes of this subtitle, the term "life insurance company" means an insurance company which is engaged in the business of issuing life insurance and annuity contracts (either separately or combined with accident and health insurance), or noncancellable contracts of accident and health insurance, if--

(1) its life insurance reserves (as defined in subsection (b)), plus

(2) unearned premiums, and unpaid losses (whether or not ascertained), on noncancellable life, accident or health policies not included in life insurance reserves,

comprise more than 50 percent of its total reserves (as

(continued...)

(...continued)

defined in subsection (c)).  For purposes of the preceding sentence, the term "insurance company" means any company more than half of the business of which during the taxable year is the issuing of insurance or annuity contracts or the reinsuring of risks underwritten by insurance companies.

(b) Life Insurance Reserves Defined.--

(1) In general.--For purposes of this part, the term "life insurance reserves" means amounts--

(A) which are computed or estimated on the basis of recognized mortality or morbidity tables and assumed rates of interest, and

(B) which are set aside to mature or liquidate, either by payment or reinsurance, future unaccrued claims arising from life insurance, annuity, and noncancellable accident and health insurance contracts (including life insurance or annuity contracts combined with noncancellable accident and health insurance) involving, at the time with respect to which the reserve is computed, life, accident, or health contingencies.

(2) Reserves must be required by law.-- Except--

(A) in the case of policies covering life, accident, and health insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation, * * *

* * * * * * *

in addition to the requirements set

(continued...)

FINDINGS OF FACT[4]

1.  General Facts

    a.  Petitioner

At all relevant times, petitioner was an Arizona corporation with its principal offices located in Scottsdale, Arizona.  It was an "insurance company" for purposes of section 816(a), and it was authorized by the State of Arizona Department of Insurance to sell disability and life insurance within the State of Arizona.

---

(...continued)

> forth in paragraph (1), life insurance reserves must be required by law.
>
> *    *    *    *    *    *    *
>
> (4)  Amount of reserves.--For purposes of this subsection, subsection (a), and subsection (c), the amount of any reserve (or portion thereof) for any taxable year shall be the mean of such reserve (or portion thereof) at the beginning and end of the taxable year.
>
> (c) Total Reserves Defined.--For purposes of subsection (a), the term "total reserves" means--
>
> (1) life insurance reserves,
>
> (2) unearned premiums, and unpaid losses (whether or not ascertained), not included in life insurance reserves, and
>
> (3) all other insurance reserves required by law.

[4] Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are incorporated herein by this reference.

Its primary and predominant business activity was writing credit life and disability insurance policies covering individuals who financed vehicles purchased from automobile dealers. During the subject years, it wrote direct credit policies that generated the following amounts of premiums from life and disability insurance:

| Year | Life insurance | Disability insurance |
|------|----------------|----------------------|
| 1989 | $3,227,739 | $2,570,868 |
| 1990 | 2,626,873 | 1,971,888 |
| 1991 | 2,590,894 | 1,807,293 |
| 1992 | 3,189,966 | 2,079,715 |

b. Notices of Deficiency

Petitioner's 1989 through 1992 Forms 1120L, U.S. Life Insurance Company Income Tax Return, reported small life insurance company deductions (see section 806) of $1,770,350, $1,792,007, $1,361,574 and $1,109,638, respectively. Respondent disallowed these deductions. According to the 1993 Notice:

> Your reinsurance agreement with Guardian Life Insurance Company of America has a significant tax avoidance effect with respect to the Trans City Life Insurance Company. Pursuant to Internal Revenue Code section 845 an adjustment is made to reserves to eliminate the avoidance effect by treating the reinsurance agreement as terminated on December 31, 1989 and reinstating the agreement on January 1, 1990.
>
> By eliminating the avoidance effect of this agreement you do not meet the requirements of a life insurance company as specified in Internal Revenue Code section 816 because the reserves necessary to meet the definition of a life insurance company do not comprise more than 50 percent of your total reserves.
>
> Therefore, it is determined that the amount of $1,770,350.00, claimed on your return as a small life insurance company deduction for the taxable year ended December 31, 1989, is not allowed.
>
> Accordingly, income is increased in the amount of $1,770,350.00 for the taxable year ended December 31, 1989.

The 1994 Notice is virtually identical to the 1993 Notice, and it states the same reason for respondent's adjustments to the years referenced therein. Neither the 1993 Notice nor the 1994 Notice disregarded the income that petitioner earned under the reinsurance agreements.

## 2. Reinsurance in General

### a. Overview

Reinsurance is an agreement between an initial insurer (the ceding company) and a second insurer (the reinsurer), under which the ceding company passes to the reinsurer some or all of the risks that the ceding company assumes through the direct underwriting of insurance policies. Generally, the ceding company and the reinsurer share profits from the reinsured policies, and the reinsurer agrees to reimburse the ceding company for some of the claims that the ceding company pays on those policies. A reinsurer may pass on (retrocede) its position on reinsurance to a third insurer. This type of agreement is called a retrocession agreement, and the third insurer is called a retrocessionaire.

Virtually all life insurance companies purchase reinsurance, and the probability of loss on any reinsurance agreement tends to be low. Reinsurance is commonly purchased to protect against single claims in excess of the level prudently borne by an insurer's financial capacity. For example, a ceding company may choose to reinsure all life insurance policies over $250,000 because it decides that $250,000 is the maximum risk that it can

assume.  Reinsurance is also commonly purchased as a financial tool for providing surplus relief or financing an investment in new business growth.  An insurer's statutory surplus will usually decrease under statutory accounting principles when it issues new policies.[5]  Although an insurer's assets increase by the amount of the premiums received on the policy, its liabilities and expenses increase by a greater amount, due, primarily, to the insurer's payment of commissions to its agents on their issuance of the policy.  Reinsurance agreements are commonly used in the insurance industry to provide the surplus relief for this depletion.

In the financial setting, the reinsurer generally transfers up-front capital (a ceding commission) to the ceding company to cover part or all of the ceding company's acquisition expense for the reinsured policies, in addition to reimbursing the ceding company for some or all of the claims that the ceding company pays under the policies.  The ceding commission is generally the amount of the surplus relief.  Reinsurance is called conventional reinsurance when the ceding commission equals the ceding company's acquisition expense plus some profit on the block of policies insured, and the reinsurer has the right to all future profits.  Reinsurance is called surplus relief reinsurance when the ceding commission is less then the amount paid under conventional reinsurance, and the ceding company shares the

---

[5] Statutory surplus equals the insurer's assets minus its liabilities.

future profits with the reinsurer.  In the case of surplus relief reinsurance, the ceding company usually receives profits after the reinsurer has recovered its ceding commission plus the stipulated profit margin.

A ceding company may accept either a known current return on reinsured policies through conventional reinsurance or a share of the policies' future profits through surplus relief reinsurance. A reinsurer pays a smaller ceding commission for surplus relief reinsurance than for conventional reinsurance because it has a right to less than all of the reinsured business' future profits. In the case of either conventional reinsurance or surplus relief reinsurance, risk is transferred if the reinsurer must reimburse the ceding company for future claims, and the reinsurer receives revenues generated by the reinsured policies regardless of experience.

State regulations usually require that an insurance company file annual statements with the insurance department of the State in which it is domiciled.  These reports must contain financial statements that show the insurer's operations as of December 31. These financial statements must show a minimum amount of surplus. Insurance companies typically enter into surplus relief reinsurance agreements at the end of the year to increase their surplus under statutory accounting principles, in order to meet these minimum surplus requirements.[6]  Although insurance

---

[6] A surplus relief reinsurance agreement usually increases the ceding company's surplus under statutory accounting
(continued...)

companies commonly enter into reinsurance agreements at the end of the year, some reinsurance agreements are consummated at other than yearend.

b.  Experience Refund Provisions

The parties to a surplus relief reinsurance agreement usually have a provision (the experience refund provision) that controls the allocation of future profits between them.  The experience refund provision usually caps the amount of profits that the reinsurer may retain from the reinsured business, which, in turn, allows the ceding company to participate in favorable experience.[7]  Experience refund provisions do not eliminate or reduce the transfer of risk because, in part, the reinsurer is liable for any loss on the reinsured policies.  An experience refund provision increases the risk to the reinsurer because a refund is a return of profits to the ceding company, which, in turn, lessens the reinsurer's cushion for absorbing future losses.

An experience account (EA) is used to account for the reinsurer's share of profits.  The EA is a notional account that tracks the profits or losses of the reinsured business.  The EA balance is referred to as the EAB.

_____

(...continued)
principles.  When the surplus is increased in this manner, the reinsurer usually realizes a corresponding decrease.

[7] In other words, the reinsurance agreement may require that some of the profits must be paid (refunded) to the ceding company, after the reinsurer has recovered its ceding commission plus the stipulated profit margin.

c.  Risk Transfer and Risk Charges

Reinsurance agreements are structured to transfer risks that are inherent in the underlying policies.  Risks commonly found in policies sold by life insurers include mortality, lapse, and investment.

Mortality is:  (1) The risk that policyholders will die and death benefits will be paid sooner than expected, in the case of life insurance, or (2) the risk that policyholders will continue to live and collect benefits longer than expected, in the case of annuity insurance.  When a life policy is reinsured, the reinsurer usually agrees with the ceding company to reimburse it for the full death benefits.  In the case of annuity contracts, the reinsurance agreement may transfer two types of mortality risk.  First, reinsurers usually realize a loss when a policyholder dies in the early years of his or her policy, because the death benefit tends to be higher than the cash value.  Second, reinsurers usually suffer a loss when the annuitization benefits which are payable according to the settlement terms of a policy are greater than anticipated due to better than expected annuitant longevity (i.e., the policyholder lives longer than predicted by standard mortality tables).

Surrender, which is also known as lapse, is the risk that a policy holder will voluntarily terminate his or her policy prior to the time that the insurer recoups its costs of selling and issuing the policy.  A reinsurer will realize a loss on the reinsurance agreement when:  (1) It receives an initial

consideration that is less than the policy's cash surrender value and (2) the policyholder terminates the policy before the initial consideration plus renewal profits exceed the cash value.

The risk of investment is threefold; namely, the risks of credit quality, reinvestment, and disintermediation. Credit quality is the risk that invested assets supporting the reinsured business will decrease in value, which, in turn, may lead to a default or a decrease in earning power. Reinvestment is the risk that invested funds will earn less than expected due to a decline in interest rates. Disintermediation is the risk that interest rates will rise, and that assets will have to be sold at a loss in order to provide for withdrawals on account of surrender or maturing contracts.

Investment risk may or may not be transferred to the reinsurer. Investment risk is fully transferred if the reinsurer receives the funds backing the block of policies to invest for its own account. If the ceding company holds the assets backing the reinsured block, the terms of the reinsurance agreement dictate whether the investment risk is borne by the ceding company or the reinsurer.

There is generally no single accepted method of quantifying the risk of mortality or surrender, and there is no recognized Federal standard. Risk may be quantified based on: (1) The amount of the reserve for the reinsured policies; i.e., the present value of future benefits less the present value of future premiums determined on a statutory basis, (2) the face

amount of the reinsured policies; i.e., the reinsurer's total contractual liability, and (3) the amount for which the reinsurer is at risk; i.e., the difference between the face amount of the policies and the reserves.

Provisions for risk charges are commonplace in reinsurance agreements to set the profit margin that a reinsurer expects to earn on the agreement. A reinsurance agreement may state, for example, that any renewal profits on the reinsured business will first accrue to the reinsurer to the extent of the risk charge, then be used to repay the reinsurer's ceding commission, and then, to the extent of any excess, returned to the ceding company through the experience refund provision. Risk transfer is not eliminated through the use of a risk charge because a reinsurer earns its charge only from actual renewal profits, if any. When claims exceed revenues, the reinsurer suffers the loss.

Actual risk transfer is a fundamental principle of reinsurance. When a purported reinsurance agreement transfers little or no insurance risk, the agreement is not reinsurance, but is the equivalent of a loan or some other type of financing arrangement.

d. Termination

Reinsurance agreements usually give the ceding company the unbridled discretion to terminate the agreement, either immediately or after a stipulated number of years. In order to exercise its right of termination, the ceding company must usually pay the reinsurer its outstanding loss (if any) at the

time of recapture.  Such a provision is intended to give reinsurers the ability to recover their investments in the case of early recaptures by a ceding company.  Risk transfer is not eliminated by a right of termination provision because losses remain with the reinsurer if the ceding company does not terminate the reinsurance.

It is common for a surplus relief reinsurance agreement to terminate when it no longer provides surplus relief.

## 3.  The 1988 and 1989 Retrocession Agreements

### a.  Overview

This litigation focuses on two retrocession agreements (the Agreements) entered into between petitioner (as the retrocessionaire) and an unrelated entity, Guardian (as the reinsurer).[8]  The Agreements were mainly surplus relief reinsurance agreements, and petitioner's costs connected to the Agreements were minimal.  The form of the Agreements was (and still is) common in the insurance industry.

Petitioner and Guardian agreed that the first agreement (the 1988 Agreement), executed on December 29, 1988, was effective October 1, 1988.  Petitioner and Guardian agreed that the second agreement (the 1989 Agreement), executed on December 28, 1989, was effective June 30, 1989.  The effective date of the 1989 Agreement coincided with the last day of the second quarter in which the 1988 Agreement was terminated, and it reflected the efforts of petitioner and Guardian to continue their relationship

_____

[8] Guardian is a mutual company domiciled in New York.

following that termination.  The effective date of the 1989

Agreement marked an anniversary of the June 30, 1987, effective

date of the underlying reinsurance agreement.

The Agreements provided that petitioner would reimburse

Guardian for benefits paid to policyholders under life insurance

and annuity plans of insurance.  Benefits included amounts

payable on the death of any insured, cash values payable when

withdrawn by policyholders or upon cancellation of the policies,

and annuity benefits payable upon policyholder annuitization.

Petitioner agreed to pay Guardian a ceding commission of $1

million on each of the Agreements, which represented the value

that petitioner was willing to pay in exchange for receiving its

share of future profits on the reinsured policies.  If the

reinsured policies were profitable, petitioner would receive all

of the profits until it recovered its $1 million ceding

commission, plus a quarterly risk charge of .3 percent of the

unrecovered balance.[9]  Afterwards, petitioner would receive 10

percent of the profits, and Guardian would receive the remaining

90 percent by way of an experience refund.  If the reinsured

policies were not profitable enough to allow petitioner to

receive its ceding commissions and risk charges, petitioner would

suffer the loss.

Petitioner could not compel Guardian to terminate the

Agreements under any circumstance.  Before January 2, 1990, and

---

[9] Prior to its amendment, the 1989 Agreement provided that
the quarterly risk fee would equal .25 percent of the unrecovered
balance.

January 2, 1991, Guardian could not recapture any of the policies underlying the 1988 Agreement and the 1989 Agreement, respectively. Beginning with each of those dates, Guardian had discretion to recapture policies under the related Agreement. If Guardian exercised this right before January 2, 1992, it had to pay an early recapture fee equal to the absolute value of any negative EAB.[10] If Guardian exercised this right after January 1, 1992, or chose to leave the reinsurance in place after that date, Guardian did not have to pay a recapture fee, and petitioner had no recourse to recover its loss. Neither Guardian nor any of its representatives promised petitioner that Guardian would make petitioner whole if it recaptured either of the Agreements after January 1, 1992, and Guardian undertook no obligation to make petitioner whole.

The Agreements were structured so that Guardian had an economic incentive to terminate the Agreements when the surplus relief, as measured by the EAB, was zero. If business was profitable, Guardian could have terminated the Agreements. Guardian also could have left the Agreements in place, when the EAB was equal to or greater than zero, if the underlying businesses generated a loss or if Guardian did not want to assume the risk of recapture. Business could have been so volatile, for example, that Guardian could have wanted to leave the Agreements in place because the cost of reinsurance would have been less

---

[10] This type of early recapture fee arrangement was common in the industry.

than the risk of future adverse experience. If the reinsured business was volatile or losses developed, and Guardian did leave the reinsurance in place, the risk of loss would have remained with petitioner. Guardian's unilateral right to terminate the Agreements increased rather than decreased petitioner's risk.

Throughout the duration of the Agreements, a negative EAB represented the remaining surplus relief generated for Guardian by the underlying agreement. The amount of the negative EAB also represented petitioner's outstanding liability for the ceding commission payable under the related Agreement. The moment that the EAB was zero was important because Guardian would have had to start paying petitioner profits from the reinsured business, rather than crediting the EAB, if the agreement continued after that time. Petitioner had no meaningful control over the operation of the EAB.

Each of the Agreements had a "funds withheld" provision that was common in the insurance industry. Such a provision eliminates unnecessary cash-flow and does not affect the economic substance of the agreement or the risk that is transferred. The "funds withheld" provision in the Agreements avoided the need for petitioner to transfer to Guardian funds equal to the ceding commission, only to have Guardian transfer funds back to petitioner for the reinsurance profits. As petitioner earned and reported renewal profits from Guardian, petitioner simply reduced its liability to Guardian by the amount of the cash that would otherwise have been transferred to it by Guardian. The "funds withheld" provision provided additional security to Guardian, and

it did not limit the risk transferred from Guardian to petitioner.

The insurance industry is heavily regulated.  Petitioner was obligated under statutory accounting principles to establish reserves for the liabilities it incurred under each of the Agreements.  Guardian would not have legitimately obtained the surplus relief it sought under the Agreements if the National Association of Insurance Commissioners (NAIC) and New York State requirements for risk transfer had not been met.[11]  Guardian would also have violated its own rules and policies, as well as State law, if it reported a statutory credit for ceding to petitioner liabilities associated with the Agreements, absent an actual transfer of risk to petitioner.  The Agreements passed to petitioner almost 100 percent of the risk held by Guardian for mortality, surrender, and investment.

b.  Purpose of the Agreements

The relationship between Guardian and petitioner was arm's-length, and each had differing interests.  Both petitioner and Guardian derived valid and substantial benefits from the Agreements, without regard to taxes.  Guardian entered into each

---

[11] The NAIC is an organization of insurance commissioners from various States who are responsible for the regulation of insurance.  The NAIC accredits State insurance departments, and it issues model regulations (which are not law unless and until they are adopted by a State) to promote uniform insurance regulation throughout the nation.  The financial statement form prescribed by the NAIC is known in the life insurance industry as the "annual statement" (annual statement), and the annual statement must be filed annually in each State in which the life insurance company does business.

of the Agreements to obtain risk coverage and to get surplus relief of $1 million.  Guardian would not have entered into either Agreement had the Agreement not increased its surplus by $1 million.  Guardian earned a spread on the difference between the risk fees it paid petitioner under the Agreements and the risk fees it received from the underlying agreements.

Petitioner entered into the Agreements to:  (1) Retain its profitable credit disability business, (2) retain the credit disability business' assets, on which it was earning investment income, and (3) maintain its life insurance status by obtaining enough life reserves (on a coinsurance basis) to satisfy the Life Ratio.  The Agreements also gave petitioner the ability to withhold the ceding commissions, while earning 1.2 percent on the risk charge and continuing to earn approximately 8 percent on the amount of the commission.

Petitioner wanted to be a life insurance company for Federal income tax purposes, and petitioner would not have qualified as a life insurance company during any of the subject years if the reserves associated with the Agreements were not included in the calculation of the Life Ratio (ignoring petitioner's alternative argument that its disability policies were noncancellable); the Life Ratio would have been less than 50 percent in each year. Petitioner's Life Ratio for 1989 through 1992 was greater than 50 percent when the reserves associated with the Agreements are included in the calculation of the Life Ratio.

Qualification as a life insurance company was petitioner's

primary business objective because it enabled petitioner to earn more money for its shareholders (irrespective of tax consequences) than any other alternative.  Instead of entering into the Agreements, petitioner could have ceded away its credit disability insurance business in order to maintain its qualification as a life insurance company.   Petitioner employed this technique both before and after the subject years.  If petitioner had ceded away its credit disability business, it would have paid less tax than it did by entering into the Agreements.

4.  1988 Agreement

    a.  Original Agreement

The 1988 Agreement was drafted by Guardian.  Under the agreement, petitioner assumed 95 percent of Guardian's interest in Guardian's:  (1) January 1, 1984, reinsurance agreement with Business Men's Assurance (BMA) and (2) January 1, 1985, reinsurance agreement with United Pacific Life Insurance Company (UPL).  Guardian retained an experience refund equal to 90 percent of the positive net cash-flow from the reinsured policies.  The experience refund provision was part of the 1988 Agreement because Guardian was unwilling to sell to petitioner the profits on business with reserves in excess of $180 million for $1 million.  The parties agreed to the 90-percent figure because the block of business was expected to be sufficiently profitable that petitioner's 10 percent of the profits would exceed the ceding commission.

James H. Gordon has been petitioner's independent actuary since its incorporation in 1967, except for 1979 to 1982. Mr. Gordon negotiated the 1988 Agreement on behalf of petitioner, and he dealt only with Jeremy Starr of Guardian. Mr. Gordon attempted to obtain for petitioner a risk fee between 1.5 and 1.8 percent. Guardian refused to pay that amount.

The effect of the 1988 Agreement on Guardian was to increase its taxable income by the $1 million ceding commission, in addition to a tax on equity that resulted from Guardian's status as a mutual insurer, and decrease its liabilities related to its coinsurance reserves. Petitioner was able to retain assets from its credit life and disability business (and the related investment income) that it would have otherwise had to cede away, and it was able to retain the underwriting profit on that business.

The 1988 Agreement did not extend any loss carryover period for petitioner. It did not eliminate for petitioner any separate return limitation year (SRLY) taint from any previous operating loss. It did not change the character of any item of income or deduction for petitioner from ordinary to capital or capital to ordinary. It did not change the source of any item of income or deduction for petitioner from foreign to domestic or domestic to foreign.

b.  First Amendment/Trust Account

The first amendment to the 1988 Agreement was completed on January 28, 1989. It required that:  (1) A trust (the Trust) be

established with First Interstate Bank of Arizona, N.A. (FIB),
(2) petitioner and Guardian each pay 50 percent of the cost of
maintaining the Trust, and (3) securities be deposited into the
Trust to secure petitioner's performance under the 1988
Agreement.  The Trust was a security device for Guardian to
secure payment of petitioner's obligations, and it was structured
to allow Guardian to receive credit on its annual statements for
the additional capital surplus it sought to obtain.

Guardian and petitioner executed an agreement with FIB,
effective December 30, 1988, establishing the Trust.  The
agreement was drafted by Guardian.  Based on discussions with
Mr. Starr, Mr. Gordon estimated that petitioner's required
deposit to the Trust as of December 31, 1988, was approximately
$850,000.  Based on this estimate, petitioner transferred
securities totaling $850,397 into the Trust in early February
1989.

During the entire period that the Trust was in existence,
petitioner had a right to receive, and received on a monthly
basis, all investment income (including interest and dividends)
from the Trust's assets.[12]  Petitioner also had a reversionary
interest in the Trust's assets, and it reported these assets on
its financial statements filed with the Arizona Department of
Insurance.  Guardian had the sole discretion to make withdrawals

---

[12] From 1989 through 1992, petitioner received investment
income totaling $252,588.

from the Trust at any time, without any further act or notice or satisfaction of any condition or qualification.

### c.  Underlying Business

The 1988 Agreement was indemnity reinsurance on a combination coinsurance, modified coinsurance plan.  The business retroceded to petitioner under the 1988 Agreement consisted of two blocks of single premium deferred annuity (SPDA) policies. The first block was insurance written by UPL during 1984, reinsured by BMA in 1984, retroceded to Guardian in 1984, and retroceded to petitioner under the 1988 Agreement.  The first block consisted of a 52.6316-percent quota share of the block of SPDA policies underlying the reinsurance agreement between UPL and BMA.  The second block was insurance written during 1985 by a subsidiary of UPL, reinsured by UPL in 1985, retroceded to Guardian in 1985 under an agreement referred to as the New York Retro, and retroceded to petitioner under the 1989 Agreement.

Petitioner had no right to terminate or in any way shift or avoid losses that might occur under the 1988 Agreement, and the 1988 Agreement did not limit petitioner's obligation to pay losses if they occurred.  Petitioner was liable on each contract underlying the Agreement to pay the amount of the benefit that corresponded to the portion of the contract reinsured (95 percent).  Petitioner was also liable:  (1) To pay a surrender benefit equal to the surrender and matured endowment benefits paid by Guardian on the portion of the contracts reinsured and (2) to pay those benefits in the same manner as

provided in the reinsured contracts.

Petitioner did not pay claims, make refunds directly to the insured, otherwise contact the insured, or perform administrative functions with respect to the policies underlying the 1988 Agreement.

### d.  Ceding Commission and Risk Charge

The ceding commission was recorded as a negative $1 million in the EAB as of October 1, 1988, and represented the pretax surplus relief generated for Guardian and the pretax statutory cost to petitioner as of that date.  Petitioner deducted the $1 million ceding commission on its 1988 Form 1120L.

The NAIC regulations applicable to the 1988 Agreement required that a reinsurer such as petitioner participate significantly in the risk of mortality, surrender, or investment. In the case of the reinsured business, the 1988 Agreement transferred to petitioner the risk of investment, surrender, excess mortality, and annuitization.  If losses were incurred and profits were insufficient to recoup the losses, petitioner maintained the burden of the losses.  The 1988 Agreement passed to petitioner the risk of paying 100 percent of the benefits on the portion of the underlying policies that it assumed.

During the period that the agreement was in effect, Guardian paid petitioner risk fees totaling $4,676.  Three thousand dollars of this amount was paid in 1988, and the remaining $1,666 was paid in 1995.  Guardian paid petitioner the $1,666 amount after petitioner discovered that the amount had not been paid as

required.

### e.  Right To Withhold

The 1988 Agreement provided that Guardian would pay petitioner reinsurance premiums and an initial consideration equal to the total reserves on the reinsurance policies in force at the start of the agreement.  The 1988 Agreement permitted Guardian to elect to withhold funds equal to the coinsurance reserves on the reinsured policies.  The 1988 Agreement permitted petitioner to elect to withhold funds equal to the ceding commission.  Guardian had to pay petitioner interest on the funds that it withheld, and petitioner had to pay Guardian interest on the funds that it withheld.

The 1988 Agreement provided that all moneys due either Guardian or petitioner would be netted against each other.  The 1988 Agreement provided that negative experience refunds could offset positive experience refunds within the same calendar year. The 1988 Agreement allowed petitioner to carry forward negative net refunds for a calendar year to future calendar years. Although the 1988 Agreement allowed each party to withhold funds equal to the amount specified in the agreement, the parties could not withhold funds in excess of the amount specified.  Within 45 days after the end of each calendar quarter, Guardian was obligated to pay petitioner, and petitioner was obligated to pay Guardian, the amounts due under the 1988 Agreement, subject to each party's right to withhold funds up to the maximum amount.

Because petitioner could not withhold funds in excess of the $1 million ceding commission, petitioner had to pay Guardian losses in excess of the amounts it was entitled to withhold if the absolute value of the negative EAB exceeded $1 million. In the event of Guardian's insolvency, petitioner was obligated to continue to fulfill its contractual liabilities under the 1988 Agreement without increase or diminution.

When Guardian and petitioner signed the 1988 Agreement, each elected to exercise its right to withhold funds. No cash changed hands at that time.

### f. Recapture

The 1988 Agreement provided that Guardian would automatically recapture a contract (but not all contracts) if the ceding company elected to recapture. Subject to termination upon recapture by the ceding company, the term of the 1988 Agreement was unlimited and could not be terminated unilaterally by petitioner. The 1988 Agreement provided that petitioner's liability with respect to a contract would terminate on the date of recapture.

### g. Termination

Termination dates for reinsurance agreements, including retroactive termination dates, are subject to negotiation, but a termination date cannot be made retroactive to a prior calendar year. The termination date of the 1988 Agreement was negotiated between the parties.

On or about February 8, 1989, UPL notified Guardian that UPL

would be effecting a recapture of the business underlying its reinsurance agreement with Guardian due to NAIC compliance issues. Guardian did not notify Mr. Gordon or petitioner of this fact until some time in the fall of 1989.

The 1988 Agreement was terminated on December 28, 1989, effective as of April 1, 1989. The effective date was the first day of the second quarter, and it was the day after the termination of the New York Retro, the earliest of the underlying agreements to terminate. By the written terms of the 1988 Agreement, Guardian had to recapture the N.Y. Retro SPDA policies from petitioner, effective March 30, 1989, as a result of the recapture of those policies by the ceding company.

## 5. 1989 Agreement

### a. In General

Following the termination of the 1988 Agreement, Guardian and petitioner negotiated and entered into the 1989 Agreement. The 1989 Agreement was very similar to the 1988 Agreement. The 1989 Agreement was negotiated by Mr. Gordon (for petitioner) and Mr. Starr (for Guardian), and it was drafted by Guardian. Although the 1989 Agreement did not provide for the continuation of the Trust, petitioner and Guardian continued to maintain the Trust to secure petitioner's performance under the 1989 Agreement and to allow Guardian to receive credit on its annual statements for statutory accounting purposes.[13] Petitioner continued to

---

[13] Petitioner continued to maintain the Trust with Guardian as its beneficiary until the Trust was terminated in 1994.

deposit into the Trust securities in the amount approximately equal to the negative EAB.

The 1989 Agreement did not extend a carryover period for tax purposes.  It did not eliminate the SRLY taint of a previous net operating loss for petitioner.  It did not change the character of an item of income or deduction for petitioner from ordinary to capital or capital to ordinary.  It did not change the source of an item of income or deduction for petitioner from domestic to foreign or foreign to domestic.  It did not artificially reduce petitioner's equity or result in any deferral of income to Guardian.

Petitioner's Federal marginal income tax rate for its 1989 taxable year was approximately 16 percent.  Petitioner's Federal marginal income tax rate for the taxable years 1990 through 1992 was approximately 18 percent.  During each of these years, Guardian was taxed at the full corporate income tax rate, including a significant equity tax under section 809.

b.  Amendments

The 1989 Agreement was amended three times.  The first amendment, completed on July 17, 1990, to be effective as of June 30, 1989, eliminated the experience refund provision, and increased the risk fee from .25 percent per quarter to .3 percent per quarter of the absolute value of the EAB.  The amount of the risk fee was within the range of risk fees normally payable by reinsurers to retrocessionaires such as petitioner.  The 1989 Agreement originally contained an experience refund provision, pursuant to which petitioner agreed to refund to Guardian

90 percent of the net cash-flow of the retroceded insurance. Petitioner's portion of the total reserves on the business reinsured under the 1989 Agreement was approximately $7.4 million, and an experience refund provision of 90 percent would have meant that the reinsured business would have had to earn $10 million in profits on assets attributable to reserves of $7.4 million, in order for petitioner to recover its $1 million ceding commission. Mr. Starr recognized the error and advised petitioner of the error shortly after the 1989 Agreement was executed. Mr. Starr found the error when he was reviewing the agreement in connection with signing his actuarial opinion.

The second amendment, effective December 31, 1991, changed the agreement from indemnity reinsurance on a combined coinsurance, modified coinsurance plan to indemnity reinsurance on a coinsurance, funds withheld plan basis. Guardian asked for this amendment because California had changed its regulations concerning modified coinsurance, and Guardian wanted to assure itself that the 1989 Agreement complied with the new regulations. Petitioner agreed to the second amendment because it had the potential to decrease petitioner's exposure under the 1989 Agreement, and petitioner's actuary was concerned that the business was not as profitable as expected.

The third amendment, completed on December 28, 1993, terminated the 1989 Agreement effective as of 12 a.m. on October 1, 1993.

c.  Underlying Business

The insurance business underlying the 1989 Agreement was volatile and risky.  UPL and Guardian entered into a reinsurance agreement on November 25, 1987, under which Guardian reinsured a portion of a block of single premium deferred annuity (SPDA) policies written from January 1 through December 31, 1987, and a portion of a block of single premium whole life (SPWL) policies written from January 1 through December 31, 1987.  Pursuant to the 1989 Agreement, petitioner assumed 30 percent of Guardian's interest in the individual life portion of the reinsurance agreement between UPL and Guardian.  The 1989 Agreement did not reinsure with petitioner any deficiency or excess interest reserves.  The reserves for the business underlying the 1989 Agreement were smaller than the reserves associated with the 1988 Agreement.

Petitioner did not pay claims, make refunds directly to the insured, or otherwise contact the insured or perform administrative functions with respect to the policies underlying the 1989 Agreement.

d.  Ceding Commission and Risk Charge

The ceding commission for the 1989 Agreement was recorded as a negative $1 million in the EAB as of June 30, 1989, and represented the pretax surplus relief generated for Guardian and the pretax statutory loss to petitioner as of that date.  The $1 million ceding commission was approximately 13 percent of the reserves attributable to petitioner under the 1989 Agreement

(i.e., $1 million ceding commission/$7.8 million of reserves.[14]
The $1 million ceding commission resulted in taxable income to
Guardian and an increase in Guardian's equity tax.  Petitioner
did not deduct the net loss attributable to the 1989 Agreement,
but capitalized it (to be amortized) under the principles of
Colonial Am. Life Ins. Co. v. Commissioner, 491 U.S. 244 (1989).
On its 1990 through 1992 Forms 1120L, petitioner claimed
deductions of $125,719, $161,613 and $165,605, respectively, for
the amortization of the loss associated with the 1989 Agreement.

Guardian paid petitioner $36,768 for risk charges on the
1989 Agreement.  The market place, through competition, limits
the upside that a reinsurer can earn on a risk charge, but does
not limit a reinsurer's downside risk.  The risk charges did not
limit petitioner's downside risk because of its obligation to pay
benefits under the Agreements.  The risk charges that a
retrocessionaire like petitioner will earn are generally less
than the risk charges that a ceding reinsurer such as Guardian
would earn.  If the experience under the reinsured policies was
bad, both Guardian and petitioner could be adversely affected.

The 1989 Agreement met the risk transfer regulations then in
effect under the laws of the State of New York.  The 1989
Agreement also met the risk transfer requirements under the 1985
NAIC model regulation concerning risk transfer.  The risks
involved with SPWL policies include:  (1) Investment, (2) excess

---

[14] Guardian also paid UPL an allowance under the reinsurance
agreement between them.  This allowance was approximately
10 percent of the reserves attributable to Guardian under the
agreement.

surrender, and (3) excess mortality.  The 1989 Agreement involved
the transfer of significant risks from excess mortality, excess
surrender, and investment.  With respect to the risk of
surrender, this risk increased as the underlying policies aged.
The insurance policies underlying the 1989 Agreement contained
surrender provisions that increased the likelihood of surrender
as the policies aged.

The 1989 Agreement obligated petitioner to pay Guardian a
death benefit equal to the death benefit paid by Guardian on the
portion of the contract reinsured so long as the 1989 Agreement
was in effect.  The 1989 Agreement also provided that petitioner
would pay Guardian a surrender benefit equal to the surrender and
matured endowment benefits paid by Guardian on that portion of
the contract reinsured, so long as the 1989 Agreement was in
effect.  The 1989 Agreement provided no way for petitioner to
escape from actual losses in the event of Guardian's insolvency.

The primary method petitioner had to recover the $1 million
ceding commission in the 1989 Agreement was through the profits
of the business.  No provision in the 1989 Agreement guaranteed
that the reinsured business would be profitable or that
petitioner would in fact recover its ceding commission.
Petitioner had the risk under the 1989 Agreement of losing more
than its $1 million ceding commission.  Petitioner had 100
percent of the risk of claims exceeding revenue.  Petitioner
could lose money if either the mortality of the insureds or the
rate of surrender under the reinsured policies turned out to be
higher than predicted.  If enough policies terminated through

death or surrender so that the losses associated with these policies exceeded the investment income due petitioner, petitioner would lose money.

### e. Right To Withhold

The 1989 Agreement provided that Guardian would pay petitioner an initial consideration equal to the total reserves on policies in force at the start of the agreement. Petitioner was obligated to pay Guardian cash if the EAB was negative by more than $1 million. Petitioner could offset negative experience refunds against positive experience refunds within the same calendar year.

The 1989 Agreement allowed both Guardian and petitioner to withhold certain funds from each other. The 1989 Agreement permitted Guardian to withhold funds equal to the coinsurance reserves on the reinsured policies. The 1989 Agreement permitted petitioner to elect to withhold funds equal to the ceding commission. When petitioner and Guardian signed the 1989 Agreement, each elected to exercise its right to withhold funds and made no cash payments.

All moneys due either Guardian or petitioner were to be netted against each other, and interest was required to be paid on the funds withheld. Cash settlements were required when the netted amounts exceeded the right of either party to withhold funds.

f.  Recapture

The 1989 Agreement had an unlimited duration, and petitioner could not unilaterally terminate it.  Although Guardian could recapture the underlying business after January 1, 1992, without paying a recapture fee, the option to do so was solely Guardian's.  At various times after January 2, 1992, Guardian could have elected to terminate the 1989 Agreement and recapture the underlying business, leaving petitioner with a significant loss.  For example, if on January 3, 1992, Guardian had elected to terminate the agreement, petitioner would have owed Guardian approximately $945,000; i.e, the amount of the negative EAB. If the 1989 Agreement had been terminated as of June 30, 1992, petitioner would have owed Guardian approximately $606,159, for the then-negative EAB.

g.  Termination

The third amendment, which terminated the 1989 Agreement, was drafted by Guardian.  The third amendment provided that each party to the 1989 Agreement waived any rights it had, that the termination was conclusive for all purposes without exception, and that neither party to the agreement would owe the other any further obligations after the termination date.  Guardian agreed to the termination because it believed that the EAB had become positive, and that it would have otherwise had to begin paying petitioner profits from the underlying business.  Petitioner agreed to the termination because the Commissioner had challenged the 1989 Agreement, and Mr. Gordon was concerned about how her

challenge might affect the agreement. Mr. Gordon also expected that Guardian would want to recapture the underlying policies.

When the third amendment was executed, Mr. Gordon believed that all settlements for amounts due petitioner had been made. In fact, settlement had not been made. As a result of this error, petitioner did not receive from Guardian moneys it was entitled to receive. The third amendment would not have been executed if Mr. Gordon had realized the error. The provision in the third amendment pursuant to which each party waived its rights also appears in the terminating amendments to the reinsurance agreement between UPL and Guardian.

When the 1989 Agreement was terminated, neither party had accurate information as to the actual status of the EAB. The accounting information provided by Guardian showed a positive EAB of $140,663. The EAB was actually negative by approximately $260,181. Although the EAB was negative, petitioner made no payment to Guardian, because neither party realized that it was negative. Neither petitioner nor Guardian would have made the decisions each did, if it had had accurate information.

## OPINION

### 1. Overview

This case takes the Court inside the complex and esoteric world of insurance law, taking into account the technical jargon and standards utilized therein. In making our findings, we have examined volumes of filings, reams of trial testimony, boxes of exhibits, and assorted expert reports. Many of the critical facts were disputed by the parties, and each party introduced

testimony, exhibits, and/or other evidence to support her or its proposed findings of fact. As the trier of fact, we have found the facts herein by evaluating and weighing the evidence before us, giving proper regard to our perception of each witness derived from seeing and hearing him or her testify on the stand. We have been guided by petitioner's expert, Diane B. Wallace, whom, as discussed below, we find to be very knowledgeable on the reinsurance industry. We have also been guided by our understanding of the insurance and reinsurance industries in general, as well as by our knowledge of the applicable statutory scheme as it relates to these industries.

The primary issue before us is one of first impression; namely, whether it was an abuse of discretion for the Commissioner to determine that each of the Agreements had "a significant tax avoidance effect" within the meaning of section 845(b). The tax avoidance effect identified by the Commissioner is that the Agreements allowed petitioner to claim and benefit from the small life insurance company deduction of section 806.[15]

---

[15] Sec. 806 provides in part:

(a) Small Life Insurance Company Deduction.--

  (1) In general.--* * * the small life insurance company deduction for any taxable year is 60 percent of so much of the tentative LICTI for such taxable year as does not exceed $3,000,000.

  (2) Phaseout between $3,000,000 and $15,000,000.-- The amount of the small life insurance company deduction determined under paragraph (1) for any taxable year shall be reduced (but not below zero) by 15 percent of so much of the tentative LICTI for such

(continued...)

- 38 -

Given the fact that there are no regulations under section 845, the Commissioner relies primarily on legislative history and her experts' opinions on industry standards to support her determination that the Agreements had a "significant tax avoidance effect" under section 845(b).  In forming our opinion, we look first to the law as written by the legislators, and we consult the legislative history primarily to resolve ambiguities in the words used in the statutory text.[16]  Landgraf v. USI Film Prods, 511 U.S. ___, 114 S.Ct 1483 (1994); Consumer Prod. Safety Commn. v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).

---

(...continued)
    taxable year as exceeds $3,000,000.

        (3) Small life insurance company deduction not
    allowable to company with assets of $500,000,000 or
    more.---

            (A)  In general.--The small life
        insurance company deduction shall not be
        allowed for any taxable year to any life
        insurance company which, at the close of such
        taxable year, has assets equal to or greater
        than $500,000,000.

                *    *    *    *    *    *    *

    (b) Tentative LICTI.--For purposes of this part--

        (1) In general.--The term "tentative LICTI" means
    life insurance company taxable income determined
    without regard to the small life insurance company
    deduction.

[16] In Western Natl. Mut. Ins. Co. v. Commissioner, 102 T.C. 338, 355 (1994), affd. 65 F.3d 90 (8th Cir. 1995), we stated that the language used in subchapter L generally had the meaning attributed thereto by experts in the field because Subchapter L was drafted by the Congress in language peculiar to the insurance industry.  We do not interpret the term "significant tax avoidance effect" according to an industry meaning, because we do not find that the term has a specific meaning in the industry.

Section 845, which was enacted as section 212(a) of the Deficit Reduction Act of 1984 (DEFRA), Pub. L. 98-369, 98 Stat. 494, 757, provides:

SEC. 845. CERTAIN REINSURANCE AGREEMENTS.

(a) Allocation in Case of Reinsurance Agreement Involving Tax Avoidance or Evasion.--In the case of 2 or more related persons (within the meaning of section 482) who are parties to a reinsurance agreement (or where one of the parties to a reinsurance agreement is, with respect to any contract covered by the agreement, in effect an agent of another party to such agreement or a conduit between related persons), the Secretary may--

(1) allocate between or among such persons income (whether investment income, premium, or otherwise), deductions, assets, reserves, credits, and other items related to such agreement,

(2) recharacterize any such items, or

(3) make any other adjustment,

if he determines that such allocation, recharacterization, or adjustment is necessary to reflect the proper source and character of the taxable income (or any item described in paragraph (1) relating to such taxable income) of each such person.

(b) Reinsurance Contract Having Significant Tax Avoidance Effect.--If the Secretary determines that any reinsurance contract has a significant tax avoidance effect on any party to such contract, the Secretary may make proper adjustments with respect to such party to eliminate such tax avoidance effect (including treating such contract with respect to such party as terminated on December 31 of each year and reinstated on January 1 of the next year).

## 2.  Lack of Regulations Under Section 845(b)

Petitioner argues that respondent may not rely on section 845(b) because she has not prescribed regulations thereunder. Petitioner argues that section 845(b), without regulations,

violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution because it does not set forth an ascertainable standard sufficient to alert taxpayers as to the section's reach. Petitioner points to the term "significant tax avoidance effect", and argues that the term is too vague to be interpreted without regulations.

We disagree with petitioner's claim that section 845(b), without regulations, is unconstitutionally vague. The Constitution does not require that the Commissioner prescribe regulations for section 845(b). See SEC v. Chenery Corp., 332 U.S. 194, 201-203 (1947); Columbia Broadcasting Sys. v. United States, 316 U.S. 407, 425 (1942). In the absence of regulations, the statutory text may be interpreted in light of all the pertinent evidence, textual and contextual, of its meaning. See Commissioner v. Soliman, 506 U.S. 168, 173 (1993); Crane v. Commissioner, 331 U.S. 1, 6 (1947); Old Colony R. Co. v. Commissioner, 284 U.S. 552, 560 (1932). Although it is true, as petitioner points out, that the Congress anticipated that regulations would be issued under section 845(b), see H. Conf. Rept. 98-861, at 1064-1065 (1984), 1984-3 C.B. (Vol. 2) 1, 318-319, it is not true, as petitioner would have us hold, that section 845(b) requires regulations in order to be effective. We find nothing in the statutory text, or in its legislative history, that conditions the section's effectiveness on the issuance of regulations. See Estate of Neumann v. Commissioner, 106 T.C. ___ (1996); H. Enters. Intl., Inc.,

v. Commissioner, 105 T.C. 71, 81-85 (1995).

We are mindful that a vital component of due process is that a statute be "reasonably clear". See Smith v. Goguen, 415 U.S. 566, 572 (1974); Grayned v. City of Rockford, 408 U.S. 104, 108-109 (1972); Retired Teachers Legal Defense Fund, Inc. v. Commissioner, 78 T.C. 280, 284-285 (1982). We conclude that section 845(b) passes that test. As will be reflected in the following discussion, the term "significant tax avoidance effect" has a discernible meaning taking into account the relevant legislative history and other aids to its interpretation.

## 3. Significant Tax Avoidance Effect

Respondent determined that the Agreements had a significant tax avoidance effect with respect to petitioner. Respondent argues that the Agreements did not transfer life insurance risk to petitioner that was proportionate to the benefit it derived from the small life insurance company deduction. Respondent relies primarily upon the testimony of her three experts, Ralph J. Sayre, Jack M. Turnquist, and Charles M. Beardsley. Mr. Sayre is a consulting actuary for Actuarial Resources of Georgia, and he is a member of various actuarial societies. Mr. Turnquist is a member of various actuarial organizations, and he has been self-employed since 1987, providing consulting services on actuarial and technical communications relative to the operation of life insurance companies. Mr. Beardsley is an actuary, and he is an expert on the annual statement reporting for insurance companies.

Petitioner argues that respondent's determination is wrong because the benefit of the small life insurance company deduction is not a tax avoidance effect under section 845(b). Petitioner also argues that the Agreements did not have a significant tax avoidance effect with respect to petitioner because the Agreements transferred the risk of loss from Guardian to petitioner. Petitioner relies mainly on the testimony of Ms. Wallace, who has been the president of the D.B. Wallace Co. from 1990 to present. The D.B. Wallace Co. specializes in reinsurance agreements and regulatory compliance with respect thereto. Ms. Wallace is also the NAIC's primary lecturer in its nationwide educational programs, which are offered to the staff of insurance regulators on the topics of accounting and regulatory compliance for reinsurance transactions.

We agree with petitioner that the Agreements did not have a significant tax avoidance effect within the meaning of section 845(b). Before explaining our reasons for that conclusion, we summarize our impressions of the experts. We have broad discretion to evaluate the cogency of an expert's analysis. Sammons v. Commissioner, 838 F.2d 330, 333-334 (9th Cir. 1988), affg. in part and revg. in part on another issue T.C. Memo. 1986-318; Ebben v. Commissioner, 783 F.2d 906, 909 (9th Cir. 1986), affg. in part and revg. in part on another issue T.C. Memo. 1983-200. We evaluate and weigh an expert's opinion in light of his or her qualifications and with regard to all other evidence in the record. Estate of Christ v. Commissioner,

480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970);
IT&S of Iowa, Inc. v. Commissioner, 97 T.C. 496, 508 (1991);
Parker v. Commissioner, 86 T.C. 547, 561 (1986).  We are not
bound by an expert's opinion, especially when it is contrary to
our own judgment.  Orth v. Commissioner, 813 F.2d 837, 842
(7th Cir. 1987), affg. Lio v. Commissioner, 85 T.C. 56 (1985);
Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976),
affg. T.C. Memo. 1974-285; Estate of Kreis v. Commissioner,
227 F.2d 753, 755 (6th Cir. 1955), affg. T.C. Memo. 1954-139.
If we believe it is appropriate to do so, we may adopt an
expert's opinion in its entirety, or we may reject it in its
entirety.  Helvering v. National Grocery Co., 304 U.S. 282,
294-295 (1938); see Buffalo Tool & Die Manufacturing Co. v.
Commissioner, 74 T.C. 441, 452 (1980).  We may also choose to
adopt only parts of an expert's opinion.  Parker v. Commissioner,
supra at 562.

We find the opinion of Ms. Wallace to be most helpful in
resolving the issues presented herein, and we rely heavily on it
in making our findings and reaching our conclusions.  Ms.
Wallace's testimony and reasoning were more clear, coherent, and
persuasive than those of her counterparts; namely, Messrs. Sayre,
Turnquist, and Beardsley.  We are unpersuaded by, and generally
do not rely on, the opinions of Messrs. Sayre, Turnquist, and
Beardsley in making our findings or in reaching our conclusions.
We find the opinions of Messrs. Sayre and Turnquist to be
inconsistent and problematic, and we generally find that their

opinions are unhelpful to us.[17]  For example, Mr. Sayre stated that petitioner and Guardian dealt at arm's length, but that each would ignore the express terms of the Agreements and change its conduct whenever it chose to do so.  We find that the record does not support the latter part of this statement.  Mr. Sayre further stated that he did not believe that the Agreements transferred any meaningful risk.  Under questioning by the Court, however, Mr. Sayre conceded that petitioner could suffer a loss under both of the Agreements.  Ms. Wallace, Mr. Starr, and Mr. Gordon were all unable to understand or reproduce many of the material results reached by Mr. Sayre.  Neither Mr. Sayre nor Mr. Turnquist adequately analyzed what would have happened under the Agreements if significant losses were to have arisen.

We turn to the substance of this case.  The applicability of section 845(b) hinges on whether a reinsurance agreement has a "significant tax avoidance effect" on any party to the agreement.  Respondent argues that the Agreements had a significant tax avoidance effect because they allowed petitioner to benefit from the small life insurance company deduction of section 806.  Respondent claims that the only reason petitioner entered into the Agreements was to qualify as a life insurance company in order to benefit from the small life insurance company deduction.  Respondent claims that the Agreements were not designed to

_____

[17] We also find that the opinion of Mr. Beardsley is of little benefit to the Court.  From our point of view, the salient parts of his testimony focused on issues that were conceded by petitioner at or before trial.

generate for petitioner anything more than nominal profits, apart from tax savings.  Petitioner replies that the benefit of the small life insurance company deduction is not a tax avoidance effect under section 845(b).  Petitioner claims that it entered into the Agreements for valid and substantial business reasons that went beyond qualifying as a life insurance company.

A tax avoidance effect must be significant to one or both of the parties to a reinsurance agreement in order for the Commissioner to exercise her authority to make adjustments under section 845(b).  The conference report on DEFRA states that a tax avoidance effect is significant "if the transaction is designed so that the tax benefits enjoyed by one or both parties to the contract are disproportionate to the risk transferred between the parties."  H. Conf. Rept. 98-861, supra at 1063; 1984-3 C.B. (Vol. 2) at 317.  This test focuses on the economic substance of the agreement, and the conference report sets forth seven factors that help determine an agreement's economic substance.  These factors, which are nonexclusive and none of which is determinative by itself, are:  (1) The duration or age of the business reinsured; (2) the character of the business reinsured; (3) the structure for determining the potential profits of each of the parties and any experience rating; (4) the duration of the reinsurance agreement between the parties; (5) the parties' right to terminate the reinsurance agreement and the consequences of a termination; (6) the relative tax positions of the parties; and (7) the general financial situations of the parties.  Id.

We turn to these factors and analyze them one at a time. We also analyze and discuss other factors that we find to be relevant to our determination.  In analyzing all of the factors, we apply a deferential standard of review because the text of section 845(b) confers broad discretion on the Commissioner similar to that of section 482 and like provisions.  We shall sustain the Commissioner's determination as within her discretion unless the determination is arbitrary, capricious or without sound basis in fact.  Capitol Fed. Sav. & Loan Association v. Commissioner, 96 T.C. 204, 213 (1991); Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 332 (1990), affd. 961 F.2d 1255 (6th Cir. 1992).

### i.  Duration or Age of Business Reinsured

The duration or age of the business reinsured bears directly on the transfer of significant economic risk between the parties. The reinsurance of new business may carry a greater risk of lapse, and thus of potential loss to the reinsurer, than the reinsurance of old business.  H. Conf. Rept. 98-861, supra at 1063, 1984-3 C.B. (Vol. 2) at 317.

The two blocks of SPDA policies underlying the 1988 Agreement and the block of SPDA policies underlying the 1989 Agreement were several years old.  Respondent argues that the history of these policies allowed petitioner to predict the policies' potential profits, which, in turn, allowed petitioner to minimize its risk through the negotiation of a ceding commissions that would be recouped out of those profits.  We

disagree.  The reinsurance of older policies under the facts herein resulted in a greater risk transfer than if the policies had been new.  In contrast to what commonly happens, the risk of surrender increased as these policies aged.  This was because the policies carried surrender charges, which decreased over time, creating an incentive to defer the surrender of the policies. As Ms. Wallace testified, the surrender rates on policies of this kind tend to be higher after surrender charges have been reduced. Mr. Starr's credible testimony also established that petitioner's risk of loss increased over time because the decreasing surrender charges reduced a source of profit for petitioner.

This factor favors petitioner.

### ii.  Character of Business Reinsured

Coinsurance of yearly renewable term life insurance (YRTLI), as contrasted to ordinary life insurance, generally does not have a significant tax avoidance effect because coinsurance of YRTLI does not involve the transfer of long-term reserves.  Id. at 1063, 1984-3 (Vol. 2) at 317.  In a typical reinsurance agreement involving YRTLI, the parties negotiate each year's risk premium that will be paid to the ceding company to cover the risk that is transferred for that year.  Because the reinsurer receives a premium each year to cover the risk for that year, the reinsurer does not establish long-term reserves.

The SPDA and SPWL policies at issue required one-time, lump-sum payments of premiums on an up-front basis, and as a consequence the policies were backed by relatively long-term

reserves. Respondent argues that these long-term reserves led to tax avoidance, and that the coinsurance-modco structure did not change the Agreements into the equivalent of YRTLI or otherwise minimize their tax avoidance effect. We disagree. Ms. Wallace testified (and we believed) that the use of the coinsurance-modco structure minimized the transfer of reserves to petitioner. Under this structure, she testified, many of the reserves stayed with Guardian instead of being transferred to petitioner. This structure was similar to the reinsurance of YRTLI.

This factor favors petitioner.

### iii. Determining Potential Profits and Experience Rating

An experience rating formula that results in the reinsurer's assuming a risk of loss beyond the annual mortality risk, as well as enjoying a share of profits commensurate with its loss exposure, may indicate that the tax benefits resulting from the assumption of reserve liabilities by the reinsurer are not disproportionate to the risk transferred between the parties. When the experience rating formula for a reinsurance agreement results in the reinsurer's receiving only an annual risk premium, plus a fixed fee, the agreement may be economically equivalent to YRTLI combined with a financing arrangement. H. Conf. Rept. 98-861, supra at 1063, 1984-3 C.B. (Vol. 2) at 317.

Respondent argues that the fee structure of the Agreements was a financing arrangement. Respondent claims that the Agreements were structured to terminate when the EAB equaled zero. Respondent concludes that petitioner rented its surplus to

Guardian in exchange for an annual fee of 1.2 percent of the outstanding surplus relief.

We do not find that the record supports respondent's argument, claim, or conclusion. As is typical with most reinsurance agreements, petitioner's profit or loss on the Agreements was only ascertainable upon the Agreements' termination. Because petitioner could not terminate the Agreements, they would continue (and petitioner would remain at risk) for as long as Guardian left the Agreements intact. Petitioner faced mortality, surrender, and annuitization risks for the duration of the Agreements. If cumulative benefit costs exceeded revenues, petitioner could be left with the losses permanently at Guardian's option. Petitioner also was to receive future profits from the blocks of policies, at a set profit margin. As Ms. Wallace testified, this method of computing the profit margin is a very common feature in reinsurance agreements. She also testified that the 1.2-percent risk charge and the 10-percent profit sharing feature were within the range of common charges for this type of agreement.

This factor favors petitioner.

iv. Duration of Agreement

A long-standing agreement for automatic reinsurance of certain types of policies tends to indicate that there is no significant tax avoidance effect when a coincidental tax benefit is enjoyed by a ceding company because income arising from the reinsurance transaction offsets an expiring loss carryover.

A longstanding policy may be ignored if the experience rating formula in effect allows the parties to tailor income, expense, and profit allocation on an individual contract basis.  Id.

Respondent notes that the Agreements arose from a new relationship, and that the duration of the 1988 Agreement was approximately 6 months.  According to respondent, these facts demonstrate tax avoidance effect.  We disagree.  Although the Agreements arose from a new relationship, the Agreements were unlimited in duration, and petitioner could not unilaterally terminate them.  Although the Agreements proved to be of a relatively short duration, this was due to Guardian's decision to recapture the underlying insurance, a decision over which petitioner had no control.  The Agreements also contained no experience rating provision that allowed the parties to tailor results on an individual contract basis.

This factor favors petitioner.

v.  Right To Terminate and Consequences of Termination

The existence of a payback provision that protects a reinsurer from losses on early termination of the reinsurance agreement following the payment of a large up-front ceding commission, but before the reinsurer has been able to enjoy the future profit stream, may be a reasonable business practice and should not automatically be viewed as having a tax avoidance effect.  On the other hand, a payback provision which allows a reinsurer to recover all of its losses in any case, through adjustments in future premiums or specific termination

provisions, indicates that the transaction is merely a financing arrangement. H. Conf. Rept. 998-861, supra at 1063, 1984-3 C.B. (Vol. 2) at 317.

Respondent concedes that the written terms of the Agreements: (1) Prevented petitioner from unilaterally terminating the Agreements and (2) obligated Guardian to pay petitioner a recapture fee only if Guardian terminated the Agreements in the initial period. Respondent claims, however, that the parties' understanding was to the contrary. According to respondent, Guardian and petitioner understood that Guardian would terminate the Agreements at petitioner's request. Respondent also claims that Guardian, upon terminating the Agreements, intended to make petitioner whole for any losses suffered.

The record does not support respondent's assertion that there was an unwritten understanding concerning the termination or recapture of the Agreements. Under the terms of the Agreements, recapture would occur solely at Guardian's option. Both Agreements contained an explicit early recapture provision, of the kind reflecting "a business practice" as described in the conference report. Neither Agreement had a payback provision of the sort which the conference report finds indicative of a mere financing arrangement.

This factor favors petitioner.

### vi. Relative Tax Positions

The relative tax positions of the parties is a factor to be

considered in determining tax avoidance effect because the economic value of income and deductions depends on the tax bracket of the insurer. Bracket shifting is possible, for example, between small and large insurers, profit and loss insurers, and life and nonlife insurers. Id.

It appears that Guardian was in a higher tax bracket than petitioner, but we find this inconclusive. We draw no inference from this factor. It is neutral.

### vii. General Financial Situations

The general financial situation of the parties is another factor to consider. The conference report states, for example, that the fact a surplus relief reinsurance agreement is entered into to protect a party from insolvency may indicate that the transaction has no significant tax avoidance effect. Id.

Respondent argues that the general financial situation of Guardian points toward a conclusion of a significant tax avoidance effect because Guardian did not need the surplus relief generated by the Agreements to protect itself from insolvency. Unlike respondent, we do not draw from the example in the conference report a negative inference that surplus relief invariably has a significant tax avoidance effect unless its object is to prevent an insolvency. Ms. Wallace testified that it is common for an insurer with excess capital and surplus in relation to liabilities to increase its return by putting that capital and surplus to work, as petitioner did via the Agreements.

This factor favors petitioner.

### viii.  Risk Transferred Versus Tax Benefits Derived

The legislative history of section 845(b) refers to a determination of the amount of:  (1) The tax benefits enjoyed by the parties to a reinsurance agreement, as well as (2) the risk transferred between the two.  H. Conf. Rept. 98-861, supra at 1063, 1984-2 C.B. (Vol. 2) at 317.  Respondent generally argues: (1) The risk fees received by petitioner under the Agreements are the appropriate measure of the risk transferred to it by Guardian and (2) the small life insurance company deduction is the tax benefit that petitioner derived from the Agreements.  Respondent concludes that Guardian did not transfer risks to petitioner which were commensurate with the latter's benefit from the small life insurance deduction.  In respondent's view, petitioner assumed minimal risk, as reflected in the size of the risk fees, while enjoying disproportionate tax benefits.

We reject respondent's position on the proper measure of risk.  A more appropriate standard is to compare the tax benefits (in this case, petitioner's tax savings from the small life insurance company deduction) to petitioner's exposure to loss under the Agreements, measuring the latter based on the difference between the face amount of the reinsured policies and the amount of reserves backing those policies.  By that reckoning, the insurance risk incurred by petitioner was not disproportionate to the tax benefits.  The risks associated with

- 54 -

the policies reinsured under the Agreements became apparent in 1991 when, as a result of financial problems experienced by UPL, significantly more of the policies were surrendered than had been expected.

We find support for our standard in the regulations of the NAIC.  In 1985, the NAIC issued its Model Regulation on Life Reinsurance Agreements (the 1985 Model Regulation).  The 1985 Model Regulation states that a ceding company may not receive credit for reinsurance if any of the following conditions exist, in substance or in effect:

> (1)  the primary effect of the reinsurance agreement is to transfer deficiency reserves or excess interest reserves to the books of the reinsurer for a "risk charge" and the agreement does not provide for significant participation by the reinsurer in one or more of the following risks: mortality, morbidity, investment or surrender benefit;
>
> (2)  the reserve credit taken by the ceding insurer is not in compliance with the Insurance Law (or Code), Rules or Regulations, including actuarial interpretations or standards adopted by the Department;
>
> (3)  the reserve credit taken by the ceding insurer is greater than the underlying reserve of the ceding company supporting the policy obligations transferred under the reinsurance agreement;
>
> (4)  the ceding insurer is required to reimburse the reinsurer for negative experience under the reinsurance agreement, except that neither offsetting experience refunds against prior years' losses nor payment by the ceding insurer of an amount equal to prior years' losses upon voluntary termination of in-force reinsurance by that ceding insurer shall be considered such a

reimbursement to the reinsurer for negative experience;

(5)  the ceding insurer can be deprived of surplus at the reinsurer's option or automatically upon the occurrence of some event, such as the insolvency of the ceding insurer, except that termination of the reinsurance agreement by the reinsurer for non-payment of reinsurance premiums shall not be considered to be such a deprivation of surplus;

(6)  the ceding insurer must, at specific points in time scheduled in the agreement, terminate or automatically recapture all or part of the reinsurance ceded;

(7)  no cash payment is due from the reinsurer, throughout the lifetime of the reinsurance agreement, with all settlements prior to the termination date of the agreement made only in a "reinsurance account," and no funds in such account are available for the payment of benefits; or

(8)  the reinsurance agreement involves the possible payment by the ceding insurer to the reinsurer of amounts other than from income reasonably expected from the reinsured policies.[18]

The NAIC issued the 1985 Model Regulation primarily to distinguish reinsurance agreements that legitimately transferred risk, from those that did not.  The NAIC was concerned that affording reinsurance treatment for regulatory purposes absent a meaningful transfer of risk did not fairly represent the financial condition of the parties to the reinsurance agreement. The 1985 Model Regulation sets forth rules for a ceding company's

---

[18] In 1992, the NAIC issued another regulation that generally updated the Model Regulation.  As of August 16, 1993, 42 States had adopted a version of the Model Regulation or its successor, or had legislation pending.

transfer of its reserves to a reinsurer.  These rules have similarities to the factors identified by the Congress in the conference report on DEFRA, with the notable exception of the factor involving the relative tax positions of the parties (with which the NAIC would not be concerned).

This factor favors petitioner.

### ix.  State Determinations

The 1989 Agreement was examined for risk transfer by the Arizona Department of Insurance and found to have transferred risk.

This factor favors petitioner.

### x.  Conclusion

We have analyzed the factors mentioned above.  Most of these factors favor petitioner.  None of these factors favors respondent's determination.   We conclude that the factors show that the Agreements did not have a significant tax avoidance effect within the meaning of section 845(b).  We conclude that respondent's determination to the contrary amounted to an abuse of discretion.  We hold for petitioner on this issue.  We have considered all arguments made by respondent for a contrary holding and, to the extent not discussed above, find them to be without merit.

## 4.  Amortization of Ceding Commissions

We turn to the final issue.  Respondent asserted in her Amendments that petitioner was not entitled to deduct or amortize any part of the ceding commissions.  Respondent alleges

that these commissions were not paid to acquire income-producing capital assets, unlike the ceding commissions in Colonial American Life Ins. Co. v. Commissioner, 491 U.S. 244 (1989). In Colonial American, the Supreme Court stated that a ceding commission is "an up-front, one-time payment to secure a share in a future income stream." Id. at 260. According to respondent, the ceding commissions were not paid by petitioner for the right to realize income from the reinsured policies because the Agreements were designed to return to petitioner income approximately equal to the amount of the commissions. Respondent bears the burden of proof on this issue. Rule 142(a); Estate of Bowers v. Commissioner, 94 T.C. 582, 595 (1990).

We find respondent's argument unpersuasive. The short answer to this question is that the ceding commissions were paid to allow petitioner to share in the future income stream from the reinsured policies. Petitioner entered into the Agreements and incurred the related commissions for valid and substantial business reasons. The ceding commissions were incurred in arm's-length transactions between unrelated parties. We find that these ceding commissions were "part of the purchase price to acquire the right to a share of future profits", Colonial American Life Ins. Co. v. Commissioner, supra at 251, and, as such, were capital expenditures that must be amortized over the life of the Agreements, id. at 252-253. Respondent has not proven otherwise.

We have considered all arguments made by respondent for a

contrary holding and, to the extent not discussed above, find them to be without merit.

To reflect the foregoing,

<u>Decision will be entered for petitioner</u>.