**The PROCTER & GAMBLE COMPANY, Petitioner–Appellee,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellant.**

Nos. 91–1515, 91–1557.

United States Court of Appeals, Sixth Circuit.

Argued March 17, 1992.

Decided April 20, 1992.

---

**1256**

Padric K. O'Brien, William Sanford Corey (Briefed), Sutherland, Asbill & Brennan, Washington, D.C., Burgess L. Doan (Briefed), Cohen, Todd, Kite & Stanford, Newport, Ky., J.D. Fleming, Jr. (Argued), Sutherland, Asbill & Brennan, Atlanta, Ga., for petitioner-appellee.

Abraham N.M. Shashy, Jr., Chief Counsel, John T. Lyons, I.R.S., Office of Chief Counsel, Gary R. Allen, Acting Chief (Briefed), Jonathan S. Cohen, Teresa McLaughlin (Argued), U.S. Dept. of Justice, Appellate Section Tax Div., Howard A. Berger, I.R.S., Washington, D.C., for respondent-appellant.

Before: KENNEDY and BATCHELDER, Circuit Judges; and TAYLOR, District Judge.*

KENNEDY, Circuit Judge.

The Commissioner of Internal Revenue appeals the decision of the Tax Court holding that allocation of income to Procter & Gamble (P & G) from a wholly-owned subsidiary under Internal Revenue Code § 482 was unwarranted. For the reasons to follow, we AFFIRM the Tax Court.

I.

P & G is an Ohio corporation engaged in the business of manufacturing and marketing consumer and industrial products. P & G operates through domestic and foreign subsidiaries and affiliates.

P & G owned all the stock of Procter & Gamble A.G. (AG), a Swiss corporation. AG was engaged in marketing P & G's products, generally in countries in which P & G did not have a marketing subsidiary or affiliate.

P & G and AG were parties to a License and Service Agreement, known as a package fee agreement, under which AG paid royalties to P & G for the nonexclusive use by AG and its subsidiaries of P & G's patents, trademarks, tradenames, knowledge, research and assistance in manufacturing, general administration, finance, buying, marketing and distribution. The royalties payable to P & G were based primarily on the net sales of P & G's products by AG and its subsidiaries. AG entered into agreements similar to package fee agreements with its subsidiaries.

In 1967, P & G made preparations to organize a wholly-owned subsidiary in Spain to manufacture and sell its products in that country. Spanish laws in effect at that time closely regulated foreign investment in Spanish companies. The Spanish Law of Monetary Crimes of November 24, 1938, in effect through 1979, regulated payments from Spanish entities to residents of foreign countries. This law required governmental authorization prior to payment of pesetas to residents of foreign countries. Making such payments without governmental authorization constituted a crime. Decree 16/1959 provided that if investment of foreign capital in a Spanish company was deemed economically preferential to Spain, a Spanish company could transfer in pesetas "the benefits obtained by the foreign capital."

---

* The Honorable Anna Diggs Taylor, United States District Judge for the Eastern District of Michi-gan, sitting by designation.

P & G requested authorization to organize P & G España S.A. (España) and to own, either directly or through a wholly-owned subsidiary, 100 percent of the capital stock of España. P & G stated that its 100 percent ownership of España would allow España immediate access to additional foreign investment, and that P & G was in the best position to bear the risk associated with the mass production of consumer products. P & G also indicated that 100 percent ownership would allow P & G to preserve the confidentiality of its technology. As part of its application, P & G estimated annual requirements for pesetas for the first five years of España's existence. Among the items listed was an annual amount of 7,425,000 pesetas for royalty and technical assistance payments. Under Spanish regulations, prior authorization of the Spanish Council of Ministers was required in order for foreign ownership of the capital of a Spanish corporation to exceed fifty percent.

The Spanish government approved P & G's application for 100 percent ownership in España by a letter dated January 27, 1968. The letter expressly stated that España could not, however, pay any amounts for royalties or technical assistance. For reasons that are unclear in the record, it was determined that AG, rather than P & G, would hold 100 percent interest in España.

From 1969 through 1979, España filed several applications with the Spanish government seeking to increase its capital from the amount originally approved. The first such application was approved in 1970. The letter granting the increase in capital again stated that España "will not pay any amount whatsoever in the concept of fees, patents, royalties and/or technical assistance to the investing firm or to any of its affiliates, unless with the approval of the Administration." All future applications for capital increases that were approved contained the same prohibition.

In 1973, the Spanish government issued Decree 2343/1973, which governed technology agreements between Spanish entities and foreign entities. In order to obtain permission to transfer currency abroad under a technology agreement, the agreement had to be recorded with the Spanish Ministry of Industry. Under the rules for recording technology agreements, when a foreign entity assigning the technology held more than 50 percent of the Spanish entity's capital, a request for registration of a technology agreement was to be looked upon unfavorably. In cases where foreign investment in the Spanish entity was less than 50 percent, authorization for payment of royalties could be obtained.

In 1976, the Spanish government issued Decree 3099/1976, which was designed to promote foreign investment. Foreign investment greater than 50 percent of capital in Spanish entities was generally permitted, but was conditioned upon the Spanish company making no payments to the foreign investor, its subsidiaries or its affiliates for the transfer of technology.

España did not pay a package fee for royalties or technology to AG during the years at issue. España received permission on three occasions to pay P & G for specific engineering services contracts. The Spanish Foreign Investments Office clarified that payment for these contracts was not within the general prohibition against royalties and technical assistance payments. España never sought formal relief from the Spanish government from the prohibition against package fees.

In 1985, consistent with its membership in the European Economic Community, in Decree 1042/1985 Spain liberalized its system of authorization of foreign investment. In light of these changes, España filed an application for removal of the prohibition against royalty payments. This application was approved, as was España's application to pay package fees retroactive to July 1, 1987. España first paid a dividend to AG during the fiscal year ended June 30, 1987.

The Commissioner determined that a royalty of two percent of España's net sales should be allocated to AG as royalty payments under section 482 for 1978 and 1979 in order to reflect AG's income. The Commissioner increased AG's income by $1,232,653 in 1978 and by $1,795,005 in

1979 and issued P & G a notice of deficiency.[1] P & G filed a petition in the Tax Court seeking review of the deficiencies.

The Tax Court held that the Commissioner's allocation of income was unwarranted and that there was no deficiency. The court concluded that allocation of income under section 482 was not proper in this case because Spanish law, and not any control exercised by P & G, prohibited España from making royalty payments.

## II.

■ This Court applies a *de novo* standard of review to legal conclusions made by the Tax Court. *Smith v. Commissioner*, 937 F.2d 1089, 1096 (6th Cir.1991).

## III.

■ P & G argues that the Tax Court correctly determined that the Commissioner was not authorized to allocate royalty income to it under section 482. At all times relevant to this action, section 482 provided:

> In any case of two or more organizations, trades, or businesses ... owned or controlled directly or indirectly by the same interests, the Secretary may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.

The purpose of section 482 is "to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer." Treas.Reg. § 1.482–1(b)(1).

It is P & G's position that section 482 requires that any distortion of income of a controlled party result from the existence and exercise of control. P & G argues that where governing law, and not the controlling party or interests, causes a distortion

of income, section 482 is unavailable to allocate income. P & G argues that the regulations promulgated under section 482 and the Supreme Court's decision in *Commissioner v. First Security Bank*, 405 U.S. 394, 92 S.Ct. 1085, 31 L.Ed.2d 318 (1972), support this position.

The term "controlled" is defined in Treas.Reg. § 1.482–1(a)(3) to include:

> any kind of control, direct or indirect.... It is the reality of the control which is decisive, not its form or the mode of its exercise.

Treas.Reg. § 1.482–1(b)(1) states the level of control that is presumed to justify making a section 482 allocation:

> The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers.

Further, Treas.Reg. § 1.482–1(c) states:

> Transactions between one controlled taxpayer and another will be subjected to special scrutiny to ascertain whether the common control is being used to reduce, avoid, or escape taxes.

The foregoing regulations recognize that in order for the Commissioner to have authority to make a section 482 allocation, a distortion in a controlled taxpayer's income must be caused by the exercise of such control. In the present case there is no evidence that P & G or AG used its control over España to manipulate or shift income. Indeed, the Tax Court held that the failure of España to make royalty payments was a result of the prohibition against royalty payments under Spanish law and was not due to the exercise of control by P & G. The Spanish prohibition is expressly found in the letter approving España's organization and in the letters permitting capital increases for España. In addition, Decrees 2343/1973 and 3099/1976 made it clear that payments for transfers of technology from

---

1. These allocations to AG resulted in increases in P & G's taxable Subpart F income under I.R.C. § 951(a)(1)(A).

Spanish entities to controlling foreign entities would be restricted.

The Supreme Court held in *First Security* that the Commissioner is authorized to allocate income under section 482 only where a controlling interest has complete power to shift income among its subsidiaries and has exercised that power. In *First Security,* two related banks offered credit life insurance to their customers. The banks were prohibited by federal law from acting as insurance agents and receiving premiums, and they referred customers to an unrelated insurance company to purchase this insurance. The insurance company retained 15 percent of the premiums for actuarial and accounting services, and transferred 85 percent of the premiums through a reinsurance agreement to an insurance company affiliated with the banks. The insurance affiliate reported the entire amount it received as reinsurance premiums as its income. The Commissioner determined that 40 percent of the affiliate's income was allocable to the banks as compensation for originating and processing the insurance. The Supreme Court set aside the Commissioner's allocation. The Court found that the holding company that controlled the banks and the insurance affiliate did not have the power to shift income among its subsidiaries unless it operated in violation of federal banking law. The Court stated that the "complete power" referred to in Treas.Reg. § 1.482–1(b)(1) does not include the power to force a subsidiary to violate the law. So here, P & G did not have the power to shift income between España and its other interests unless it violated Spanish law. The payment or non-payment of royalties in no way depended on P & G's control of the various entities. The same result—no royalties—would exist in the case of unrelated entities.

The Commissioner argues that *First Security* is not controlling in this case because the Supreme Court's analysis is limited to instances in which allocation under section 482 is contrary to federal law. We are not persuaded. The Supreme Court focused on whether the controlling interests utilized their control to distort income.

We see no reason to alter this analysis because foreign law, as opposed to federal law, prevented payment of royalties. The purpose of section 482 is to prevent artificial shifting of income between related taxpayers. Because Spanish law prohibited royalty payments, P & G could not exercise the control that section 482 contemplates, and allocation under section 482 is inappropriate. That foreign law is involved may require a heightened scrutiny to be sure the taxpayer is not responsible for the restriction on payment. But that is not suggested in the case of the Spanish law here which was in effect long before España was created.

The Commissioner argues that P & G could have paid, under Decree 16/1959, an annual "dividend." The Commissioner argues that P & G has not shown that a dividend would have been forbidden under Spanish law, and asserts that the Commissioner would have treated such a dividend as a royalty for United States tax purposes. Assuming that España had profits from which it could pay a dividend under Spanish law, we find that P & G had no such obligation. A taxpayer need not arrange its affairs so as to maximize taxes as long as a transaction has a legitimate business purpose. *Salyersville National Bank v. United States,* 613 F.2d 650, 653 (6th Cir.1980). We firmly disagree with the Commissioner's suggestion that P & G should purposely evade Spanish law by making royalty payments under the guise of calling the payments something else. Furthermore, the record reflects that España did not have distributable earnings from which to pay dividends. P & G's federal income tax returns indicate that España had accumulated deficits during the years at issue and would be unable to distribute dividends.

The Commissioner argues that the Tax Court erred by refusing to apply Treas.Reg. § 1.482–1(b)(6), the "blocked income" regulation. Treas.Reg. § 1.482–1(b)(6) provides in pertinent part:

> If payment or reimbursement for the sale, exchange, or use of property, the

rendition of services, or the advance of other consideration among members of a group of controlled entities was prevented, or would have been prevented, at the time of the transaction because of currency or other restrictions imposed under the laws of any foreign country, any distributions, apportionments, or allocations which may be made under section 482 with respect to such transactions may be treated as deferrable income.

This regulation recognizes the problem posed by restrictions placed on payments in a foreign currency. Income allocated under section 482 may be deferred if payments have been blocked by currency or other restrictions under the laws of a foreign country. The Tax Court determined that because section 482 did not apply to the present case, the regulations promulgated under section 482 likewise did not apply.

The Commissioner argues that this regulation is designed to remedy the situation presented in this case. We disagree. Treas.Reg. § 1.482–1(b)(6) contemplates the situation where a temporary restriction under foreign law prevents payments, and defers the allocation of income until such time as the payments are no longer restricted. This case does not present a situation in which payments to P & G were temporarily restricted; rather, Spanish law prohibited payment of royalties altogether. This prohibition cannot be viewed as temporary because it was ultimately repealed in 1987. At the time in question, there was no reason for P & G to believe that the Spanish government would lift this ban; therefore, the payments that España was prohibited by law from making cannot be viewed as temporarily blocked payments.

The Commissioner also argues that the prohibition on royalty payments was temporary and that P & G could have deferred royalty payments under this regulation and then at some future time P & G could have liquidated España and taken its capital out of Spain. Upon liquidation, the Commissioner argues, the temporary prohibition on payment of pesetas would end. We find this argument to be meritless because P & G need not organize its subsidiaries in such a way as to maximize its tax liabilities. There is no question that P & G may legally structure its affairs in its own best interest. *Salyersville*, 613 F.2d at 653. We agree with the Tax Court that Treas.Reg. § 1.482–1(b)(6) does not apply to this case.

IV.

Accordingly, the decision of the Tax Court that allocation of income under section 482 is inappropriate is AFFIRMED.