# United States Tax Court

T.C. Memo. 2023-135

THE COCA-COLA COMPANY AND SUBSIDIARIES,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 31183-15.                    Filed November 8, 2023.

————

*John Michael Luttig, Sanford W. Stark, Lisandra Ortiz, Jonathan S. Massey, Steven R. Dixon, Gregory G. Garre, Laurence H. Tribe, Carl Terrell Ussing, Lamia R. Matta, John F. Craig III, Shay Dvoretzky, Saul Mezei, Michael D. Kummer,* and *Kevin L. Kenworthy,* for petitioner.

*Lisa M. Goldberg, Heather L. Lampert, Steven D. Garza, Veronica L. Richards, Elizabeth P. Flores, Julie Ann P. Gasper, Eli Hoory, Justin L. Campolieta, Huong T. Bailie,* and *Jill A. Frisch,* for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*: This Opinion addresses a question, involving petitioner's Brazilian manufacturing affiliate, that was left unresolved in *Coca-Cola Co. & Subs. v. Commissioner*, 155 T.C. 145 (2020). Before diving into that question, some background may be helpful.

The Coca-Cola Company (TCCC) is the ultimate parent of a group of entities (Company) that do business in more than 200 countries throughout the world. *Id.* at 148. TCCC and its domestic subsidiaries (petitioner) joined in filing consolidated Federal income tax returns for 2007–2009. Upon examination of those returns, the Internal Revenue Service (IRS or respondent) made adjustments that increased petitioner's aggregate taxable income by more than $9 billion, producing tax

[*2] deficiencies that the IRS determined to be in excess of $3.3 billion. *Id.* at 148–49.

These deficiencies chiefly resulted from transfer-pricing adjustments under section 482,[1] by which the IRS reallocated income to petitioner from its foreign manufacturing affiliates. *Coca-Cola*, 155 T.C. at 149. These affiliates, to which we refer as "supply points," manufactured concentrate—syrups, flavorings, powder, and other ingredients—used to produce petitioner's branded soft drinks (including Coca-Cola, Fanta, and Sprite). *Ibid.* The supply points sold concentrate to independent Coca-Cola bottlers throughout the world (excluding the United States and Canada). *Ibid.* The bottlers used the concentrate to produce finished beverages that they marketed to millions of retail establishments worldwide. *Ibid.*

To enable the supply points to manufacture and sell concentrate, petitioner licensed them to use its intangible property (IP). *Id.* at 149–50. On its tax returns for 2007–2009, petitioner took the position that the arm's-length compensation the supply points were obligated to pay for use of these intangibles (royalty obligation) should be calculated using the "10-50-50" method. *Id.* at 150–51. That was a formulary apportionment method to which petitioner and the IRS had agreed as a mechanism for settling a dispute regarding petitioner's tax liabilities for 1987–1995. *Id.* at 151. That settlement, embodied in a closing agreement executed in 1996, permitted a supply point to satisfy its royalty obligation to petitioner by paying actual royalties or by paying dividends. *Ibid.*

The closing agreement was valid and binding only for the tax years it covered, i.e., for 1987–1995. *Id.* at 204–07.[2] But for all subsequent years petitioner continued to use the 10-50-50 method to calculate the supply points' royalty obligations. *Id.* at 150. The gist of

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round monetary amounts to the nearest dollar.

[2] The 1996 closing agreement had only one significant prospective feature, providing that, if petitioner employed the 10-50-50 method to determine a supply point's royalty obligation for years after 1995, and if the IRS upon examination of petitioner's return determined that a higher Product Royalty was due, petitioner would "not be subject to the accuracy-related penalty under section 6662 * * * with respect to the portion of any underpayment that is attributable to an adjustment of such Product Royalty." *Coca-Cola*, 155 T.C. at 206.

[*3] respondent's position is that the amounts thus calculated for 2007–2009 did not sufficiently compensate petitioner for use of its intangibles.

Our November 2020 opinion addressed all but one of the issues in the case. Our principal holding was that the Commissioner did not abuse his discretion in reallocating income to petitioner using a "comparable profits method" that treated independent Coca-Cola bottlers as comparable parties. *See id.* at 217. The IRS regarded these bottlers as comparable to the supply points because they operated in the same industry, faced similar economic risks, had similar contractual relationships with petitioner, employed many of the same intangible assets (petitioner's brand names, trademarks, and logos), and ultimately shared the same income stream from sales of petitioner's beverages. In essence we held that the independent Coca-Cola bottlers furnished a benchmark for arm's-length profitability and that, to the extent the supply points enjoyed profits in excess of that benchmark, the excess must be reallocated to petitioner as compensation for use of petitioner's intangibles. *See id.* at 217–18.

The question remaining for decision involves petitioner's Brazilian supply point.[3] It paid no actual royalties to petitioner during 2007–2009. *Id.* at 282. Rather, it compensated petitioner for use of TCCC's intangibles by paying dividends of $886,823,232, the aggregate amount of the royalty obligation that petitioner calculated using the 10-50-50 method. We held that the Brazilian supply point's arm's-length royalty obligation for 2007–2009 was actually about $1.768 billion, as determined by the IRS in the notice of deficiency. *See id.* at 197–98, 237. But we held that the dividends remitted in place of royalties should be deducted from that sum. *See id.* at 287. This offset reduces the net transfer pricing adjustment to petitioner from the Brazilian supply point to about $882 million.

The issue we must now decide is whether this $882 million net transfer-pricing adjustment is barred by Brazilian law. During 2007–2009 Brazil capped the amounts of trademark royalties and technology transfer payments (collectively, royalties) that Brazilian companies could pay to foreign parent companies. *Id.* at 261; *see* Brazil Law No. 4131/1962, Art. 14, No. 8383/1991, Art. 50 (collectively, Brazilian legal

---

[3] Formed in 1962, Coca-Cola Indústria e Comércio Limitada was petitioner's first supply point in Brazil. Succeeding it was Coca-Cola Indústrias Limitada, which operated during the years at issue. *See id.* at 154 n.5. We will refer to these entities collectively as the Brazilian supply point.

[*4] restriction).[4] The parties have stipulated that the Brazilian legal restriction capped the royalties payable by the Brazilian supply point to petitioner at roughly $16 million for 2007, $19 million for 2008, and $21 million for 2009. *See Coca-Cola*, 155 T.C. at 261. Petitioner contends that Brazilian law thus blocks the $882 million net transfer-pricing adjustment we have sustained as arm's-length compensation to petitioner for use of its intangibles.

In briefs filed during 2018 and 2019, respondent contended that the Brazilian legal restriction should be given no effect in determining the arm's-length transfer price, relying on what is commonly called the "blocked income" regulation. *See* Treas. Reg. § 1.482-1(h)(2). This regulation generally provides that foreign legal restrictions will be taken into account for transfer-pricing purposes only if four conditions are met, including the requirement that the restrictions must be "applicable to all similarly situated persons (both controlled and uncontrolled)." *See id.* subdiv. (ii)(A). Petitioner urged that the blocked income regulation did not apply here and that, if it did apply, it was invalid under the Administrative Procedure Act (APA) and/or *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

When the Court issued its November 2020 opinion in this case, challenges to the validity of the blocked income regulation had been taken under advisement by another Division of this Court. *See 3M Co. & Subs. v. Commissioner*, T.C. Dkt. No. 5816-13. We accordingly reserved ruling on the parties' arguments regarding the effect of the Brazilian legal restriction "until an opinion in the *3M* case has been issued." *Coca-Cola*, 155 T.C. at 261. On February 9, 2023, the Court issued a reviewed opinion in *3M* that rejected the taxpayer's *Chevron* and APA arguments and sustained the validity of the blocked income regulation. *See 3M Co. & Subs. v. Commissioner*, No. 5816-13, 160 T.C. (Feb. 9, 2023).

After the Court issued its opinion in *3M*, we invited the parties to address in supplemental briefs the applicability of the Brazilian legal restriction to this case. The parties filed simultaneous briefs directed to this question in March 2023, followed by simultaneous reply briefs in April 2023.

---

[4] Copies of the relevant Brazilian statutes, in their English translation, appear in the record of this case as joint exhibits.

[*5]                    FINDINGS OF FACT

We incorporate our findings in *Coca-Cola*, amplifying certain factual findings as needed for purposes of this Opinion.

A.    *The Brazilian Supply Point's Exploitation of TCCC's Assets*

During 2007–2009 the Brazilian supply point exploited TCCC's intangible assets, including its patents, brand names, logos, secret formulas, proprietary manufacturing processes, and mixing protocols. *See Coca-Cola*, 155 T.C. at 149–50. TCCC was the owner of 114 (and nearly all) of the Company's patents registered in Brazil. These patents covered aesthetic designs (such as bottle shapes and caps), vending and dispensing equipment, packaging materials (such as polymers, vacuum panels, and coatings), beverage ingredients (such as plant sterols and sweeteners), and production processes. *See id.* at 188. TCCC's patents, secret formulas, proprietary manufacturing processes, confidential ingredients, and mixing protocols were essential to the Brazilian supply point's operations. The supply point could not have manufactured concentrate without access to those intangibles.

Among the intangible assets the Brazilian supply point exploited were TCCC's registered trademarks for original Coca-Cola (Coke Red), Fanta, Sprite, and their lines and extensions (core brands) and its trademarks for numerous other beverages sold in Brazil (non-core brands). *Id.* at 193–94. TCCC-owned brands generated roughly 98% of the Brazilian supply point's gross revenues during 2007–2009. The core brands accounted for roughly 80% of those revenues. The non-core brands accounted for about 20%.

B.    *TCCC's Trademark Registrations in Brazil*

TCCC had registered nine trademarks in Brazil between 1912 and 1962, when the Brazilian supply point was formed. *Id.* at 193, 257. Five of these trademarks related to Coke Red, covering the product names Coca-Cola and Coke, the stylized label, and the Spencerian script. *Ibid.* Two related to Fanta and two to Sprite, covering those product names and their stylized labels. *Ibid.*

Between 1962 and November 17, 1985, TCCC registered an additional six trademarks in Brazil. *Id.* at 194, 257. Five of these trademarks related to Coca-Cola, covering the dynamic ribbon and the product names Coke Light, Coca-Cola Light, and Coke Classic, and the sixth trademark related to Sprite. *Ibid.* We will refer to the 9 trademarks

**[\*6]** registered before 1962 and the 6 trademarks registered between 1962 and November 17, 1985, as the pre-1986 registered trademarks. All 15 of those trademarks related to TCCC's core brands.

Between November 17, 1985, and the tax years at issue, TCCC registered in Brazil 53 additional trademarks relating to the core brands. *Id.* at 194, 260 n.57. These trademarks covered Coke Zero, Diet Fanta, the Coca-Cola contour bottle shape, the Coca-Cola polar bear, the "S" logo related to Sprite, secondary design features for the core brands, advertising slogans, and composites of existing trademark elements. *See ibid.* TCCC also registered more than 100 Brazilian trademarks for its newer, non-core, beverage products, including Dasani, Minute Maid, Powerade, Aquarius, Burn, Kuat, and other local Brazilian brands. *See ibid.*

Brazil amended its trademark law in 1997 to recognize, for the first time, implied licenses of registered trademarks not included in legally enforceable written agreements. *See* Brazil Law No. 9279/1996, Art. 140(2). That same law also codified for the first time the principle of trademark exhaustion, whereby the owner of a registered trademark was prohibited from blocking the resale of a product identified with the trademark once the owner had introduced the product for sale in Brazil. *See id.* Art. 132. However, Brazilian courts have interpreted the amended trademark law to allow a registered trademark owner to protect against "parallel imports." *See* T.J.R.S, Apelação Cível No. 70002659688, Sexta Câmara Cível, Relator: Des. João Pedro Freire, 01.08.2001. Parallel imports—sometimes referred to as the "grey market"—occurred when products identified with a registered trademark were first sold outside Brazil and then imported into Brazil for resale by persons whom the trademark owner had not authorized to make such sales.

Trademark registrations in Brazil expire after ten years but may be renewed. Brazil Law No. 9279/1996, Art. 133. If a pre-1997 trademark was renewed after 1997, the registered owner enjoyed the right to protect its trademarked products against parallel imports. TCCC after 1997 renewed many of the trademarks in question. Thus, the Brazilian supply point continued to enjoy after 1997 the right of protection against parallel imports of TCCC-trademarked products.

[*7] C.    *TCCC's Agreements with the Brazilian Supply Point*

Between 1963 and 1966, TCCC and the Brazilian supply point executed four agreements addressing the use of TCCC-owned trademarks and other IP.  The first agreement, executed on February 1, 1963, granted the supply point a license to use specified trademarks in the Coke Red family, as well as all "required materials for" and "instructions and other information necessary to enable it to manufacture Coca-Cola concentrate and/or syrup."  Two later agreements, executed in September 1964 and November 1966, granted the supply point a similar license to manufacture Sprite and Fanta, respectively.  Each agreement provided that the license would continue for an indefinite period but was cancelable at TCCC's option upon 30 days' written notice.  To compensate TCCC for the use of TCCC's IP, the supply point was supposed to pay a royalty embedded in the price of the ingredients it purchased from TCCC.

Brazil's attributive system of trademark registration grants trademark ownership and associated rights through registration and not use.  None of the agreements described in the preceding paragraph was recorded with the Brazilian Patent & Trademark Office (BPTO).[5] Before 1991, the BPTO generally would not record a royalty-bearing license agreement (or agreement providing for the payment of technology transfer fees) if the agreement was between a Brazilian company and its foreign parent.  Agreements not recorded with the BPTO, such as the three agreements described in the preceding paragraph, were not enforceable against third parties under Brazilian law.

A fourth agreement was executed on February 19, 1963, 18 days after the first agreement described above.  Unlike the other three, this agreement was recorded with the BPTO.  It granted the supply point a license covering the use of Coke Red trademarks that had been registered before that date.  This agreement also contained a "catch-all" provision, which purported to include within the license

> all other marks, as well as any and all renewals thereof, that may be hereafter registered by [TCCC] in connection with the manufacture, preparation, promotion, advertising and sale of the products protected by the said trademark

---

[5] The BPTO was created in 1970.  Its predecessor agency was the National Department of Industrial Property.  For simplicity, we refer to these agencies collectively as the BPTO.

[*8]     registrations and, for this purpose, to affix said trademarks to the products and their containers . . . .

The February 19, 1963, recorded agreement specified that the license was granted for an undetermined period and could be revoked by TCCC upon 90 days' notice. Unlike the three unrecorded agreements, which provided for compensation to TCCC through an embedded royalty, the recorded agreement required the Brazilian supply point to make a one-time payment of $100, stating that no "payment of any royalty, fee, or compensation whatsoever, outside the sum of [$100]," was required.

Between 1981 and 1996, TCCC and the Brazilian supply point amended the BPTO-recorded agreement numerous times. *Coca-Cola*, 155 T.C. at 194. All of these amendments were likewise recorded with the BPTO. The principal purpose of the amendments was to expand the list of trademarks to include some trademarks covering products outside the Coke Red family. *Ibid.*

As of November 17, 1985, the BPTO-recorded agreement (as amended) encompassed the use of eight trademarks covering the product names and core design features for Coca-Cola, Coke, Fanta, the Fanta contour bottle shape, and Sprite. A later amendment dated August 30, 1993, expanded the trademark list to include five trademarks covering the dynamic ribbon and the product names Coke Light, Coca-Cola Light, Coke Classic, and Sprite. Two trademarks, covering Coca-Cola in Spencerian script and the Sprite contour bottle shape with the Sprite logo, were purportedly licensed by the Brazilian supply point to its subsidiary, Recofarma, after November 17, 1985. But the record contains no evidence that these two trademarks were ever included in any written agreement or amendment thereto (recorded or otherwise) between TCCC and the Brazilian supply point.

D.     *Dividends Paid by the Brazilian Supply Point to Satisfy Its Royalty Obligation*

The Brazilian legal restriction applies only to trademark royalties and technology transfer fees paid by a Brazilian company to a foreign company by which it is controlled. For 2007–2009, Brazilian law capped the royalties payable to petitioner by the Brazilian supply point at about $16 million, $19 million, and $21 million, respectively, or roughly $56 million in the aggregate. The parties have stipulated that the Brazilian

[*9] legal restriction has no application to royalties paid by a Brazilian company to a non-controlling (or unrelated) entity.

Brazilian law permits a Brazilian company to pay dividends out of its earnings and profits. The parties have stipulated that Brazilian law placed no restrictions on the Brazilian supply point's ability to pay dividends to petitioner. During 2007–2009 the Brazilian supply point paid petitioner dividends of $475 million, $447 million, and $428 million, respectively, for a total of roughly $1.35 billion.

Of that total, petitioner treated roughly $887 million of dividends, the amount it calculated using the 10-50-50 method, as compensation for the use of TCCC's intangible assets. The parties have stipulated that, under Brazilian law, the Brazilian supply point during 2007–2009 could legally have paid petitioner dividends exceeding $1.768 billion, the aggregate transfer-pricing adjustment from the Brazilian supply point as determined in the notice of deficiency.

## OPINION

### A. *"Blocked Income"*

We confront at the threshold the question whether the Brazilian legal restriction, which prevented the supply point from paying royalties in excess of $56 million during 2007–2009, actually blocked the payment of arm's-length compensation for the use of TCCC's intangibles. During these years the Brazilian supply point paid no royalties whatsoever to petitioner, not even the modest amounts permitted by Brazilian law. Rather, it compensated TCCC for use of these assets exclusively by remitting dividends. Employing the 10-50-50 method, petitioner calculated the supply point's aggregate royalty obligation as $886,823,232. Petitioner caused the supply point to pay dividends exceeding that sum, and it treated $886,823,232 of such dividends as compensation for the use of TCCC's intangible assets.

Petitioner has stipulated that Brazilian law placed no limit on the supply point's payment of dividends. And petitioner has stipulated that the supply point during 2007–2009 could legally have paid petitioner dividends in excess of $1.768 billion, the aggregate transfer-pricing adjustment from the Brazilian supply point that we have sustained. Petitioner thus concedes that the Brazilian legal restriction posed no obstacle to the supply point's payment (via dividends) of the amount petitioner believed to be arm's-length compensation for use of TCCC's intangibles. But if that is so, why does the Brazilian legal restriction pose an

**[*10]** obstacle to the supply point's payment (via dividends) of the larger amount this Court has determined to be arm's-length compensation for use of TCCC's intangibles?

By way of answer to that question, petitioner relies chiefly on *Procter & Gamble Co. v. Commissioner*, 95 T.C. 323 (1990), *aff'd*, 961 F.2d 1255 (6th Cir. 1992). That case involved tax years antedating the promulgation of the blocked income regulation. Procter & Gamble Co. (P&G), a U.S. taxpayer, owned 100% of Procter & Gamble A.G. (AG), a Swiss company. *Id.* at 324. AG in turn owned 100% of Procter & Gamble España, S.A. (España), a Spanish company that manufactured soaps, toiletries, cleaning supplies, and other P&G products. *Id.* at 325–26. España paid no royalties and made no technology transfer payments for use of P&G's intangible assets. *Id.* at 327. The IRS made a section 482 allocation from España to AG for 1978 and 1979, calculated as a 2% royalty on España's net sales of P&G products. *Procter & Gamble*, 95 T.C. at 331. That reallocation increased P&G's subpart F income under section 951(a)(1)(A). *Procter & Gamble*, 95 T.C. at 331.

During the tax years involved in *Procter & Gamble*, Spain placed no restrictions on a Spanish company's payment of royalties to an unrelated entity. *Id.* at 338 n.6. However, Spanish law operated to prohibit royalty payments "between a Spanish corporation with foreign investment in excess of 50 percent . . . and its foreign parent and subsidiaries." *Ibid.* We accordingly found that "Spanish law prohibited España from making royalty payments to AG." *Id.* at 336.

Citing *Commissioner v. First Security Bank of Utah, N.A.*, 405 U.S. 394, 400 (1972), this Court held that "section 482 simply does not apply where restrictions imposed by law, and not the actions of the controlling interest, serve to distort income among the controlled group." *Procter & Gamble*, 95 T.C. at 332–36. "Because Spanish law prohibited or blocked Espana from paying royalties to AG," we concluded, "it effectively precluded AG from receiving the same." *Id.* at 337. And we held that the breadth of the Commissioner's authority under section 482 did not justify a different result, reasoning that "section 482 does not impel the violation of a legal prohibition solely for the sake of matching income and expense." *Procter & Gamble*, 95 T.C. at 339 (citing *Commissioner v. First Sec. Bank*, 405 U.S. at 404–05). We acknowledged that P&G "possibly could have organized Espana so that royalties could be paid," but we held that "a taxpayer need not arrange its affairs so as to maximize its taxes as long as the transaction in question has substance." *Id.* at 338 (citing *Gregory v. Helvering*, 293 U.S. 465 (1935)). In sum,

**[\*11]** because P&G "ha[d] not utilized its control over AG and Espana so as to improperly shift income"—the deflection of income having been caused instead "by operation of Spanish law"—we held that the Commissioner's reallocation of income was arbitrary and capricious. *See id.* at 331, 341.

The U.S. Court of Appeals for the Sixth Circuit affirmed, agreeing that "the failure of España to make royalty payments was a result of the prohibition against royalty payments under Spanish law and was not due to the exercise of control by P&G." *Procter & Gamble Co. v. Commissioner*, 961 F.2d at 1258. Assuming that point arguendo, the Government argued that España could have paid a dividend to AG and that "the Commissioner would have treated such a dividend as a royalty for United States tax purposes." *Id.* at 1259. The Sixth Circuit rejected that argument, finding: "[T]he record reflects that España did not have distributable earnings from which to pay dividends" but rather "had accumulated deficits during the years at issue and would be unable to distribute dividends." *Ibid.* In any event the Sixth Circuit "firmly disagree[d] with the Commissioner's suggestion that P&G should purposely evade Spanish law by making royalty payments under the guise of calling the payments something else." *Ibid.* The appellate court reasoned (as did our Court) that a "taxpayer need not arrange its affairs so as to maximize taxes as long as a transaction has a legitimate business purpose." *Ibid.*[6]

Given the peculiar facts of this case, it is not clear that *Procter & Gamble* dictates the answer to the threshold question presented here—that is, whether the Brazilian legal restriction actually blocked payment by the Brazilian supply point of arm's-length compensation for use of TCCC's intangibles. The two cases are distinguishable in a relevant factual respect. The Spanish subsidiary in *Procter & Gamble* "did not have

---

[6] Petitioner similarly relies on *Exxon Corp. & Affiliated Cos. v. Commissioner*, T.C. Memo. 1993-616, 66 T.C.M. (CCH) 1707, *aff'd sub nom. Texaco, Inc. & Subs. v. Commissioner*, 98 F.3d 825 (5th Cir. 1996). That case, which likewise involved tax years before promulgation of the blocked income regulation, involved a Saudi Arabian legal restriction that prohibited the resale of Saudi crude at prices above the official Saudi selling price, which was below prevailing market prices for oil of similar quality. *See id.* at 1708. Adopting an analysis similar to that employed by the courts in *Procter & Gamble*, the courts in *Exxon/Texaco* held that the Saudi legal restriction precluded a section 482 allocation keyed to the difference between the official Saudi price and prevailing market prices. *Texaco*, 98 F.3d at 831; *Exxon*, 66 T.C.M. (CCH) at 1760. *Exxon/Texaco* differs from *Procter & Gamble* and the instant case in that the Saudi legal restriction applied even-handedly to transactions involving unrelated as well as related parties. *See Exxon*, 66 T.C.M. (CCH) at 1743.

**[\*12]** distributable earnings from which to pay dividends," but rather "had accumulated deficits during the years at issue and would be unable to distribute dividends." *Id.* at 1259. The Brazilian supply point, by contrast, paid petitioner dividends of roughly $1.35 billion during 2007–2009. And petitioner concedes that, under Brazilian law, the Brazilian supply point could legally have paid petitioner dividends exceeding $1.768 billion, the aggregate transfer-pricing adjustment that we have sustained.

Petitioner urges that "[d]ividends and royalties are different," and we of course do not dispute that statement as a general proposition. But this argument sidesteps the fact that *petitioner itself* treated dividends from the Brazilian supply point as a *substitute for royalties* for purposes of satisfying what petitioner believed to be the supply point's royalty obligation. In other words, petitioner took the position that, for Federal tax purposes, dividends from the Brazilian supply point could be used to satisfy the latter's obligation to pay petitioner arm's-length compensation for the use of TCCC's intangibles. It seems inconsistent for petitioner to argue that dividends can be treated as deemed royalties up to the amount petitioner thought to be correct, but not in the larger amount that the Court has determined to be correct.

Petitioner cites *Commissioner v. First Security Bank*, 405 U.S. at 405, for the proposition that the Commissioner's power under section 482 does not "include[] the power to force a subsidiary to violate the law." Recharacterizing dividend payments as royalties, petitioner says, would "circumvent Brazilian law" and "effectively imput[e] to the taxpayer a violation of foreign law." According to petitioner, *Procter & Gamble* "makes clear that the IRS cannot force the taxpayer to do that."

Once again, petitioner's arguments seem hard to square with the facts of this case. Petitioner has stipulated that Brazilian law placed no restrictions on the Brazilian supply point's ability to pay dividends. And petitioner concedes that the Brazilian supply point could legally have paid petitioner dividends exceeding $1.768 billion during 2007–2009. By causing the supply point to pay dividends in this amount, petitioner would not be "forc[ing] a subsidiary to violate the law." *Commissioner v. First Sec. Bank*, 405 U.S. at 405.

Nor would the payment of such dividends "circumvent Brazilian law." For 2007–2009 the Brazilian legal restriction capped total royalty payments from the Brazilian supply point to petitioner at $56 million. But petitioner caused the Brazilian supply point to pay dividends of

**[\*13]** $886,823,232 and treated that amount as compensation for use of TCCC's intangibles. We assume that petitioner did not think it was impermissibly "circumventing Brazilian law" by doing this. That being so, it is hard to see how petitioner would be circumventing Brazilian law by causing the supply point to remit a larger volume of dividends as compensation for use of TCCC's intangibles.[7]

Finally, petitioner cites *Procter & Gamble Co. v. Commissioner*, 961 F.2d at 1259, for the proposition that a "taxpayer need not arrange its affairs so as to maximize taxes as long as a transaction has a legitimate business purpose." *See also Procter & Gamble*, 95 T.C. at 338. That oft-cited maxim fits poorly with the facts here. From 1996 through 2007, petitioner consistently "arranged its affairs" in a manner that treated dividends paid by the Brazilian supply point as deemed royalties for Federal tax purposes, *up to* the dollar amount that petitioner believed to constitute arm's-length compensation for use of TCCC's intangibles. No one is suggesting that petitioner should have arranged its affairs differently. The only question is whether petitioner picked the right number—that is, the amount corresponding to the supply point's true arm's-length royalty obligation—and we held that it did not.

It seems to us that petitioner is attempting to use Brazilian law as both a shield and a sword. For Federal income tax purposes, petitioner took the position that Brazilian law permitted it to receive dividends in lieu of royalties as compensation for use of TCCC's intangibles, *up to* the dollar amount that petitioner viewed as representing arm's-length compensation. But it seeks to use Brazilian law as a sword to prevent the receipt of dividends in lieu of royalties in a larger dollar amount—specifically, in the dollar amount that this Court has determined to constitute arm's-length compensation. This one-way ratchet is not entirely convincing.

For these reasons, we think respondent advances a reasonable argument that the Brazilian legal restriction, which prevented the supply point from paying royalties in excess of $56 million during 2007–2009, did not actually "block" the payment of arm's-length compensation

---

[7] The Brazilian legal restriction seems to have been designed to protect the Brazilian fisc by preventing foreign companies from extracting profits from a Brazilian subsidiary via payments (like royalties or technology transfer fees) that would be tax-deductible by the subsidiary. Dividends were not tax deductible by the payor company in Brazil. Payment of dividends in lieu of royalties to a controlling foreign company would not "circumvent" Brazilian law because dividends would not erode the Brazilian tax base.

**[*14]** for use of TCCC's intangibles. If that is so, respondent might prevail under the law as it existed before 1994, when the Treasury Department promulgated Treasury Regulation § 1.482-1(h)(2). Had this Court in *3M* invalidated the regulation, we would need to decide this question. But because the Court sustained the regulation's validity, we proceed to consider how the regulation applies here, assuming arguendo that the Brazilian legal restriction accomplished the blocking function that petitioner ascribes to it.

B. *Satisfaction of the Regulation's Conditions*

Treasury Regulation § 1.482-1(h)(2)(i) provides that a foreign legal restriction will be taken into account for transfer-pricing purposes "to the extent that such restriction affects the results of transactions at arm's length." "Thus, a foreign legal restriction will be taken into account only to the extent that it is shown that the restriction affected an uncontrolled taxpayer under comparable circumstances for a comparable period of time." *Ibid.*

Implementing this general rule, the regulation specifies four conditions, all of which must be satisfied before a foreign legal restriction will be given effect in determining the arm's-length transfer price. For purposes of this case, we need go no further than the first condition: A foreign legal restriction (whether temporary or permanent) will be taken into account only if, and so long as, the restriction is "publicly promulgated [and] generally applicable to all similarly situated persons (both controlled and uncontrolled)." *Id.* subdiv. (ii)(A).

The foreign legal restriction at issue here, like the restriction at issue in *3M*, was enacted by Brazil. And the terms of this Brazilian legal restriction were the same during 2007–2009, the tax years involved here, as in 2006, the tax year involved in *3M*. We held in *3M* that the Brazilian legal restriction failed to satisfy one or more of the conditions set forth in the regulation. We reach the same conclusion here, for the same principal reason: The Brazilian legal restriction has no application to royalties paid to unrelated parties, but only to royalties paid to a controlling foreign company. Thus, as petitioner concedes, the legal restriction is not "generally applicable to all similarly situated persons (both controlled and uncontrolled)." *Ibid.*

C. *Grandfather Clause*

Conceding that it cannot meet the conditions set forth in Treasury Regulation § 1.482-1(h)(2), petitioner contends that the regulation's

**[\*15]** effective-date provision exempts or "grandfathers" the intangible assets exploited by the Brazilian supply point. Treasury Regulation § 1.482-1(j)(4) provides: "These regulations will not apply with respect to transfers made or licenses granted to foreign persons before November 17, 1985 . . . ." This grandfather clause is subject to the proviso that the blocked income regulation "will apply . . . to transfers or licenses before such date[] if, with respect to property transferred pursuant to an earlier and continuing transfer agreement, such property was not in existence or owned by the taxpayer on such date." *Ibid.* Petitioner has the burden of proving (1) which of TCCC's intangibles were covered by this grandfather clause and (2) what portion of the Commissioner's transfer-pricing adjustment reflects income attributable to such grandfathered assets. *See* Rule 142(a).

Petitioner asserts that "all [of TCCC's] economically significant intangibles were licensed to the Brazilian supply point before November 17, 1985." In advancing this argument, petitioner focuses almost exclusively on trademarks, largely ignoring other intangibles (non-trademark IP) that were essential to the supply point's manufacturing operations. With respect to trademarks, petitioner focuses on 15 pre-1986 trademarks, all relating to its core brands and in use during 2007–2009, that were analyzed by its expert, Dr. Franklyn, at trial. But only 8 of these trademarks were licensed under the February 19, 1963, agreement recorded with the BPTO, and they were the only trademarks enforceable against third parties under Brazilian law. Another 53 trademarks covering TCCC's core brands were licensed to the supply point after November 17, 1985, and the blocked income regulation clearly applies to them. The same is true for more than 100 trademarks covering petitioner's non-core brands, all of which were licensed to the supply point after the regulation's effective date.

1.    *Non-Trademark IP*

During 2007–2009 the intangible assets exploited by the Brazilian supply point included TCCC's patents, secret formulas, confidential ingredients, mixing protocols, and proprietary manufacturing processes. *See Coca-Cola*, 155 T.C. at 149–50. TCCC was the registered owner of 114 patents in Brazil. These patents covered (among other things) aesthetic designs (such as bottle shapes and caps), packaging materials, beverage ingredients (such as plant sterols and sweeteners), and production processes. TCCC had a robust research program at its central research laboratory in Atlanta, investigating new sugar substitutes, environmentally friendly packaging materials, and other innovations,

**[*16]** and the supply points had access to the fruits of this research. *See id.* at 158.

The Brazilian supply point manufactured concentrate. Its manufacturing activity consisted of procuring raw materials and using TCCC's guidelines and production technologies to mix and convert these materials into concentrate. *Id.* at 160. The manufacturing process entailed various forms of extraction, filtration, mixing, blending, aging, and precision filing. *Ibid.* In performing these activities the supply point employed TCCC's secret formulas, production processes, proprietary mixing specifications, and confidential ingredients, many of which could be obtained only through Company-owned flavor plants. *Ibid.* The entire production process was "governed by a detailed manufacturing protocol dictated by TCCC." *Ibid.*

Exploitation of the intangibles described above was essential to the Brazilian supply point's ability to discharge the manufacturing activities that generated its revenues. After completing the manufacturing process, the supply point packaged the concentrate into kits tailored to the needs of the bottlers to which it distributed. *See ibid.* In producing these kits the supply point presumably used TCCC's trademarks—e.g., the product names Coca-Cola, Fanta, and Sprite—to identify the contents of each kit. But its use of (and reliance on) TCCC's trademarks in the manufacturing process was quite limited, particularly as compared with the bottlers, who employed TCCC's product names, stylized labels, and aesthetic designs in manufacturing every single bottle and can they produced annually.

Although petitioner asserts that "the non-trademark intangibles . . . were also licensed [to the Brazilian supply point] before November 17, 1985," it has supplied no persuasive evidence to support that assertion. The BPTO-recorded agreement dated February 19, 1963, as amended as of November 17, 1985, addresses only trademarks. It does not purport to license any other IP.

The only references to non-trademark IP are found in the three agreements that were *not recorded* with the BPTO. The February 1, 1963, agreement authorized the Brazilian supply point to use specified trademarks in the Coke Red family, as well as all "required materials for" and "instructions and other information necessary to enable it to manufacture Coca-Cola concentrate and/or syrup." Two other agreements, executed in September 1964 and November 1966, granted the

**[*17]** supply point a similar authorization to manufacture Sprite and Fanta, respectively.

For three reasons, these agreements do not carry the day for petitioner. First, "the sole owner of [an] intangible" for section 482 purposes is considered to be "[t]he legal owner of [the] intangible pursuant to the intellectual property law of the relevant jurisdiction, or the holder of rights constituting an intangible pursuant to contractual terms (such as the terms of a license)." Treas. Reg. § 1.482-4(f)(3)(i)(A); Temp. Treas. Reg. § 1.482-4T(f)(3)(i)(A) (2006); *see Coca-Cola*, 155 T.C. at 242–45. The three agreements referenced above were not recorded with the BPTO, and those agreements were thus unenforceable against third parties in Brazil. The Brazilian supply point, therefore, was not the legal owner of the non-trademark IP "pursuant to the intellectual property law" of Brazil. *See* Temp. Treas. Reg. § 1.482-4(f)(3)(i)(A). Nor was it the "owner of rights constituting an intangible pursuant to . . . a license," *see ibid.*, because it had no rights to protect that property against use by third parties.

Second, even if these agreements afforded rights against third parties, they did not identify any specific intangibles (apart from trademarks) that were the subject of the license. Rather, they referred in general terms to "required materials" and "instructions and other information necessary" for manufacturing TCCC's products. Petitioner has supplied no evidence that terminology as vague as this would suffice under Brazilian law to license a company's patents, secret formulas, proprietary manufacturing processes, and other non-trademark IP.

Third, the three unrecorded agreements were executed between 1963 and 1966, and they were never amended. At best, therefore, those agreements could have licensed the Brazilian supply point to use TCCC's non-trademark IP as it existed before 1967. During the ensuing 40 years, TCCC "maintained an active R&D program to explore new beverages, ingredients, sweeteners, and packaging." *Coca-Cola*, 155 T.C. at 158. During this period TCCC created a variety of new beverages within its core product family, including Coke Light, Coca-Cola Light, Coke Classic, Coke Zero, and Diet Fanta. It also launched dozens of new products in addition to its core brands, including Dasani, Minute Maid, Powerade, Aquarius, Burn, Kuat, and other local Brazilian beverages. These new beverage products, as well as technological improvements and modifications to TCCC's original brands, necessarily involved new patents, formulas, secret ingredients, proprietary mixing protocols, and proprietary manufacturing processes. None of this post-1966 non-

[*18] trademark IP was covered by the three unrecorded agreements discussed above.

2.    *Trademarks*

a.    *Original Eight Trademarks*

As of November 17, 1985, the BPTO-recorded agreement (as amended) licensed the Brazilian supply point to utilize eight trademarks in use during the tax years at issue. They covered the product names and core design features for Coca-Cola, Coke, Fanta, Sprite, and the Fanta contour bottle shape. Because this agreement was recorded with the BPTO, it endowed the Brazilian supply point with legally enforceable rights. With respect to these trademarks, the Brazilian supply point was thus the "holder of rights constituting an intangible." Treas. Reg. § 1.482-4(f)(3)(i)(A); Temp. Treas. Reg. § 1.482-4T(f)(3)(i)(A). Respondent agrees that these eight trademarks are covered by the grandfather clause because the blocked income regulation does not apply to "licenses granted to foreign persons before November 17, 1985." Treas. Reg. § 1.482-1(j)(4).

While conceding that TCCC licensed the original eight trademarks to the Brazilian supply point before November 17, 1985, respondent notes that TCCC after that date renewed those licenses in Brazil. In at least one respect, the licenses as thus renewed conferred additional protection—namely the right, afforded by a 1997 amendment to Brazil's IP law, to protect against parallel imports. Respondent urges that the rights associated with the eight trademark renewals "were not in existence" on November 17, 1985, and hence are not covered by the grandfather clause. Petitioner resists this argument.

On this point we agree with petitioner. The grandfather clause specifies that the blocked income regulation "will not apply with respect to transfers made or licenses granted to foreign persons before November 17, 1985." *Ibid.* TCCC accomplished its license renewals by taking certain prescribed steps with the relevant Brazilian authorities. By taking these steps, TCCC did not transfer any property to the supply point, nor did it license any additional property to the supply point. The renewal simply preserved the status quo, ensuring that the original, pre-1986 trademark license would not expire.

Respondent seeks support for his argument from the second sentence of the effective-date provision. It provides that the blocked income regulation "will apply . . . to transfers or licenses before [November 17,

**[\*19]** 1985] if, with respect to property transferred pursuant to an earlier and continuing transfer agreement, such property was not in existence or owned by the taxpayer on such date." *Ibid.*

We think respondent's reliance on this proviso is misplaced. The proviso seeks to capture "property transferred" pursuant to "an earlier and continuing transfer agreement." The February 19, 1963, recorded agreement contained a "catch-all" provision stating that it covered the trademarks enumerated in the agreement "as well as any and all renewals thereof." We assume arguendo that the agreement, by virtue of this verbiage, may be classified as "an earlier and continuing transfer agreement." But we fail to see what "property [was] transferred" when the trademarks were renewed. The renewals did not effect any transfer of property from TCCC to the supply point, but simply preserved the status quo. Any incremental rights that arose thereby—e.g., the right to protect against parallel imports after 1997—arose solely by virtue of changes to Brazilian law, not by virtue of any "transfer" or other action between TCCC and the supply point. We thus conclude that these eight trademarks, as originally licensed and as renewed, are covered by the grandfather clause.

#### b. *Additional Seven Trademarks*

Dr. Franklyn's analysis covered 15 trademarks. Eight of those trademarks, as discussed above, were enumerated in the February 19, 1963, BPTO-recorded agreement. Seven other trademarks, registered by TCCC in Brazil between 1960 and 1983, were not listed in that agreement. Five of those trademarks, covering the dynamic ribbon and the product names Coke Light, Coca-Cola Light, Coke Classic, and Sprite, were first enumerated in an August 30, 1993, amendment to the recorded agreement. The remaining two trademarks, covering Coca-Cola in Spencerian script and the contour bottle with the Sprite logo, were never specifically enumerated in a written license agreement or amendment thereto (recorded or otherwise). Because these seven trademarks were not licensed by a BPTO-recorded agreement before November 17, 1985, they were not legally enforceable against third parties in Brazil as of that date. We accordingly conclude that they were not covered by the grandfather clause.

Petitioner advances three principal arguments against this conclusion. First, it contends that the catch-all provision in the recorded agreement, granting the supply point the right to use "all other marks . . . that may be hereafter registered by [TCCC]," caused the

**[\*20]** seven trademarks to be licensed to the supply point as soon as TCCC registered or renewed them in Brazil.

We disagree. For a license to be enforceable against third parties under pre-1997 Brazilian law, the license needed to have been specifically enumerated in a written agreement and recorded with the BPTO. *See* Brazil Law No. 9279/1996, Art. 140(2). Any such agreement was required to list the name, date of registration, and registration number of each licensed trademark. *See ibid.* For this reason, the catch-all provision could not have caused the seven trademarks to be licensed to the supply point when TCCC registered or renewed them. The February 19, 1963, agreement, in which the catch-all provision was included, contained none of the names, dates of registration, or registration numbers of any of the seven trademarks.

Second, petitioner contends that the course of dealing between TCCC and the Brazilian supply point endowed the latter with an "implied license" to use the seven additional trademarks. We reject this argument as well. Brazil's attributive system of trademark registration grants trademark ownership and associated rights through registration and not use. Brazil did not recognize implied trademark licenses until 1997, when it amended its trademark law to recognize, for the first time, implied licenses of registered trademarks not included in a legally enforceable written agreement. *See ibid.* As of November 17, 1985, therefore, the Brazilian supply point had no implied license to use the seven additional trademarks.[8]

Third, petitioner argues that the supply point should be deemed a licensee of the seven additional trademarks as a matter of "economic substance." Again we disagree. The regulations provide that legal ownership of an intangible, while the paramount consideration, is not dispositive if "such ownership is inconsistent with the economic substance of the underlying transactions." Treas. Reg. § 1.482-4(f)(3)(i)(A); Temp. Treas. Reg. § 1.482-4T(f)(3)(i)(A). But as we held in our opinion, "only the Commissioner, and not the taxpayer, may set aside contractual

---

[8] Petitioner cites the testimony of Dr. Viegas, one of respondent's experts, as "acknowledging that Brazilian law recognize[d] implied licenses" before 1997, when Brazil amended its IP law so to provide. We disagree. As we read her testimony, she was suggesting that Brazil before 1997 might have recognized an implied license for the limited purpose of protecting a Brazilian company from cancellation of the trademark by the putative licensor. But her testimony offers no support for the proposition that an implied license, before 1997, could give rise to legally enforceable rights in Brazil against third parties.

[*21] terms as inconsistent with economic substance."  *Coca-Cola*, 155 T.C. at 245.  As we explained, *id.* at 246:

> Notably absent from this regulation is any provision authorizing *the taxpayer* to set aside its own contract terms or impute terms where no written agreement exists.  That is not surprising:  It is recurring principle of tax law that setting aside contract terms is not a two-way street.  In a related-party setting such as this, the taxpayer has complete control over how contracts with its affiliates are drafted.  There is thus rarely any justification for letting the taxpayer disavow contract terms it has freely chosen.  But because the terms of such contracts may be self-serving and tax-motivated, the regulations regularly authorize the Commissioner to set contract terms aside if they do not reflect economic reality.

For these reasons, we reject petitioner's "economic substance" argument, as well as its other arguments urging that the Brazilian supply point be recognized as a pre-1986 deemed licensee of the seven additional trademarks. Five of these trademarks were enumerated in a BPTO-recorded license agreement only after November 17, 1985, and two were never enumerated in any written license agreement at all.  Because these seven trademarks were not the subject of "transfers made or licenses granted to [a] foreign person[]" before November 17, 1985," Treas. Reg. § 1.482-1(j)(4), they are not covered by the grandfather clause.

3. *Additional 53 Trademarks Covering Core Products*

Between November 17, 1985, and the tax years at issue, TCCC registered in Brazil 53 additional trademarks relating to Coca-Cola, Fanta, Sprite, and their lines and extensions.  *Coca-Cola*, 155 T.C. at 194.  These trademarks covered Coke Zero, Diet Fanta, the Coca-Cola contour bottle shape, the Coca-Cola polar bear, the "S" logo related to Sprite, secondary design features for these product families, advertising slogans, and composites of existing trademark elements.

Petitioner concedes that these 53 trademarks are not covered by the grandfather clause.  But citing testimony of Dr. Franklyn, its expert witness at trial, it contends that these 53 trademarks are "redundant, highly related, derivative of or superfluous to" the 15 trademarks registered before November 17, 1985.  Petitioner then asserts that "there is

[*22] *no value* allocable to trademarks licensed on or after November 17, 1985, because the value of those trademarks is de minimis" in the hands of the holder of trademarks registered previously.

We disagree with petitioner's submission in the extreme form in which it is advanced. We have determined that 7 of the 15 pre-1986 trademarks are not covered by the grandfather clause. Petitioner has not shown that the 53 trademarks are "redundant and derivative" once those 7 trademarks are removed from the relevant universe.

Moreover, at least 4 of the 53 trademarks—covering the product names Coke Zero and Diet Fanta, the Coca-Cola contour bottle shape, and the "S" logo related to Sprite—were independently significant in an economic sense. And they held value for the Brazilian supply point because it manufactured concentrate for these beverage products. We agree with petitioner that trademarks used primarily for marketing purposes, such as advertising slogans and composites of existing trademark elements, had only incremental economic value. But these trademarks were basically irrelevant to the supply point anyway because it engaged in no consumer marketing.

4. *Trademarks Covering Non-Core Products*

TCCC was the registered owner in Brazil of more than 100 trademarks related to its non-core beverage products. During 2007–2009, these products included Dasani, Minute Maid, Powerade, Aquarius, Burn, Kuat, and other local Brazilian brands. Sales of these noncore products accounted for roughly 20% of the Brazilian supply point's revenue. All trademarks for these newer products were registered after November 17, 1985. None of these trademarks is covered by the grandfather clause.

D. *Allocation of Value Between Grandfathered Intangibles and Those Not Grandfathered*

Petitioner has shown that eight of TCCC's trademarks were licensed to the supply point before November 17, 1985. Those are the only intangibles in commercial use during 2007–2009 that were covered by the grandfather clause. We find that petitioner has failed to carry its burden of proving what portion of the Commissioner's adjustment is attributable to income derived from this (relatively small) subset of the licensed intangibles. And the record does not contain data from which we could make a reliable estimate of that percentage.

**[\*23]**  While we do not dispute the tremendous economic value inherent in TCCC's trademarks generally, we find that TCCC's non-trademark IP held the greatest relative value for the supply points, including the Brazilian supply point.  After all, the supply point was engaged in *manufacturing*.  In producing concentrate, it employed TCCC's patents, secret formulas, production processes, proprietary mixing specifications, and confidential ingredients, all "governed by a detailed manufacturing protocol dictated by TCCC."  *Id.* at 160.  Without access to this non-trademark IP, the Brazilian supply point could not have earned a single dollar (or rial) of revenue.

The Brazilian supply point did need access to certain of TCCC's trademarks in order to distribute concentrate to bottlers.  But this distribution function was not complex.  The Brazilian supply point was "permitted to sell concentrate only to bottlers that had an existing contract with TCCC."  *Id.* at 172.  And the bottlers "agreed to purchase concentrate from whichever supply point TCCC dictated."  *Id.* at 224.  The supply point thus sold concentrate "to preordained buyers."  *Ibid.*

Because the supply point sold concentrate to preordained buyers, it had no occasion to use TCCC's trademarks for economically significant marketing purposes.  By contrast, the bottlers and service companies were much heavier users of TCCC's trademarks.  The bottlers placed those trademarks on every bottle and can they manufactured and on every delivery truck in their fleet.  *See id.* at 264.  And the service companies, which arranged consumer marketing, continuously exploited the trademarks in television, print, and social media advertising.  *See id.* at 240, 263–64.

We conclude that all non-trademark IP exploited by the Brazilian supply point was outside the scope of the grandfather clause.  The blocked income regulation thus applies to that portion of the transfer-pricing adjustment attributable to exploitation of those intangible assets.  We further find that this non-trademark IP represented the bulk of the value that the Brazilian supply point derived from use of TCCC's intangibles generally.  Petitioner has supplied no evidence that would enable us to determine, or even to guess, what percentage of the overall value was attributable to the residual intangible assets, i.e., the trademarks.

Roughly 20% of the supply point's revenue was attributable to sale of non-core brands, i.e., beverages outside the Coca-Cola, Fanta, and Sprite families.  TCCC owned virtually all of those non-core trademarks,

[*24] and all of them were registered after November 17, 1985. All of this trademark IP was thus outside the scope of the grandfather clause.

Petitioner concedes that the 53 core-product trademarks registered after November 17, 1985, are outside the scope of the grandfather clause. Petitioner has failed to quantify the relative value of those 53 trademarks, simply insisting that their value was zero or "de minimis." We find that the value of these trademarks—particularly those covering the product names Coke Zero and Diet Fanta, the Coca-Cola contour bottle shape, and the "S" logo related to Sprite—was not de minimis.

This leaves the 15 pre-1986 core-product trademarks. Petitioner has shown that eight of these are covered by the grandfather clause, and we agree that they are among "the . . . most important marks." *Id.* at 257. But as Dr. Franklyn found, the other seven pre-1986 trademarks were also important, and we have determined that they are not covered by the grandfather clause. Petitioner has supplied no evidence that would enable us to estimate the portion of the aggregate transfer-pricing adjustment that is attributable to exploitation of the eight original trademarks, as opposed to the seven additional trademarks.

In sum, petitioner has failed to satisfy its burden of proof in two major respects. It has offered no evidence that would enable us to determine what portion of the transfer-pricing adjustment is attributable to exploitation of the non-trademark IP, which we have found be the most valuable segment of the intangibles from the Brazilian supply point's economic perspective. And petitioner has offered insufficient evidence to enable us to determine what portion of the transfer-pricing adjustment is attributable to exploitation of the 8 original core-product trademarks, as opposed to the 60 other core-product trademarks and the entire universe of non-core-product trademarks. Because petitioner has failed to establish what portion of the aggregate transfer-pricing adjustment might be attributable to exploitation of the eight grandfathered trademarks, we have no alternative but to sustain that adjustment in full.

To implement the foregoing,

*Decision will be entered under Rule 155.*